[Crim. No. 8341. Third Dist. Aug. 6, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM HENRY MILLER, Defendant and Appellant.

COUNSEL

Sean P. Dowling for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and J. Rodney Davis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FRIEDMAN, J.**—Opinion on rehearing. A jury trial resulted in defendant's conviction of attempted murder, assault with a deadly weapon and

use of a firearm in the commission of both offenses. He appeals, charging erroneous denial of his motion to suppress.

The victim was William Karr, an informer whose undercover work had led to several narcotics convictions in Nevada County. On May 4, 1974, Karr received a telephone call from an anonymous person who said he had narcotics information to give him. Karr discussed the proposal with a sheriff's officer, who agreed to supply protection. When the caller phoned again, he and Karr agreed that the caller would pose as a hitchhiker, that Karr would pick him up at a designated place and he would give Karr the information. Karr drove toward the agreed place, followed by the sheriff's officer in another vehicle. Karr was armed with a .22 pistol. He picked up the hitchhiker, a bearded individual whom Karr later identified as defendant. The man told Karr to drive along a dirt road. The sheriff's officer was unable to maintain contact. When Karr's vehicle reached a wooded area he refused to drive farther. At that point the bearded individual pulled out a .22 caliber revolver, fired a number of shots at Karr and fled. Although Karr was seriously wounded, he was able to drive back to his home in Nevada City.

At defendant's trial a witness named Heron testified that he met defendant at a park in October 1974. Defendant told Heron that he had shot a narcotics agent six times pursuant to an agreement with four persons convicted of narcotics offenses, each of whom had agreed to contribute $250 for the shooting.

On December 4, 1974, Deputy Sheriff Nostrand and other law enforcement officers went to appellant's residence in Grass Valley. The officers had a warrant to arrest defendant on a forgery charge and had a search warrant for items taken in the burglary of the residence of Earl Strathman, including personal checks and credit cards. Both defendant and his great-grandmother were home. Defendant was placed under arrest immediately but was not physically restrained. Deputy Nostrand went into defendant's bedroom and commenced to search for the items listed in the search warrant. Nostrand then opened the top drawer of the dresser. At that moment defendant entered the bedroom, reached rapidly into the open drawer, grabbed a small book, declared, "That's mine," and commenced to leave the room. Nostrand had not noticed the book until defendant grabbed it. Nostrand took the book from defendant. On its cover was printed the word "diary." The officers did not examine the diary at the time but took it with other seized items to the sheriff's office for examination.

In the diary was an entry dated April 27, reading as follows: "I'll just sum up this month. I'm strung out. I've written about $150 worth of bad checks. I've been going to Sac, copping almost every day. _____ , _____ _____ and myself have planned the _____ _____ _____ _____ _____. The plan will be executed by me. I've never met him. I don't even know what he looks like. But I'll find out, 'cause _____ was mentioned for doing the job. If I do this I'll admit to myself that I'm totally insane."

An analysis by an expert in the area of examining documents testified that the obliterations on the page dated April 27 covered the words "Darrel," "Dennis," and "Bob," then the words "murder," "off," "Bill," "Karr," and finally the figure "$500.00." This same expert found that pages were torn from the diary. An analysis of impressions on the page following the torn-out pages revealed the following words and letters: "I dig it," "I killed Bill," "p," "car," "to," "me," "a," "_ist," "ma," "t," "to," "Pick," "t," "him."

 The diary was not one of the items designated in the search warrant. The sole claim on appeal is that the trial court erred in not suppressing the diary and the evidence resulting from it. ■ Defendant invokes the general rule that only property described in the warrant may be seized. He recognizes the "nexus" rule, which permits seizure of additional items under limited circumstances but argues that the diary is outside its scope.

The nexus rule originated in *Warden* v. *Hayden* (1967) 387 U.S. 294, 307 [18 L.Ed.2d 782, 792, 87 S.Ct. 1642], which articulated it as follows: "There must . . . be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction."

The quoted rule applies with equal force to a lawful warrantless search and to searches authorized by a warrant. "In both situations the same fundamental proposition controls—the scope of a search must be circumscribed by the reasons which justified its inception. It is by this rational limitation that the Fourth Amendment protects the individual against unfettered discretion. (*Terry* v. *Ohio, supra,* 392 U.S. 1, 29 [20 L.Ed.2d 889, 910-911, 88 S.Ct. 1868]; *Marron* v. *United States* (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74].) In short, the 'nexus rule' is

necessary to achieve what we intended in *Skelton*—a 'realistic balancing of the requirements of effective law enforcement and the necessity to protect the privacy of the citizen from unwarranted governmental intrusion.' (*People* v. *Skelton* [Skelton v. Superior Court], *supra,* 1 Cal.3d 144, 158 [81 Cal.Rptr. 613, 460 P.2d 488].)" (*People* v. *Hill* (1968) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1].)

As described in *Warden* v. *Hayden, supra,* the nexus rule pivots on the officer's probable cause to believe that the seized article will aid in a particular apprehension or conviction. Probable or reasonable cause is defined " 'as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. . . . No exact formula exists for determining reasonable cause, and each case must be decided on the facts and circumstances presented to the officers at the time they were required to act.' " (*People* v. *Terry* (1970) 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961].)

 Defendant argues that only the seized item may form the source of probable cause; that his behavior with reference to it was an impermissible factor. A statement uttered arguendo in *People* v. *Hill, supra,* furnishes seeming support for defendant's contention. As quoted *supra,* the *Hill* opinion declares: " . . . the scope of a search must be circumscribed by the reasons which justified its inception." (12 Cal.3d at p. 762.) Viewed literally, the *Hill* declaration would restrict the range of probable cause to those factors which were existent and known when the officer sought the search warrant. Viewed literally, the declaration would exclude probable cause stemming from events and circumstances at the time and place of the search.

Viewed so literally, the *Hill* dictum is out of kilter with the concept of probable cause. The dictum requires interpretation to place it within the context of the state Supreme Court's discussion. An honest and strong suspicion may have its origin in one or a combination of objects, events and circumstances. As the "man of ordinary care and prudence" conducts his authorized search for the items designated in the warrant, one or several factors may arouse an honest and strong suspicion directed at previously unsuspected objects. The object may have intrinsic suspicion-arousing qualities; thus, as the *Warden* formulation suggests, contraband automatically provides a nexus. Where the object is evidence and not contraband, it will seldom be the sole source of an honest and strong suspicion. Rather, it will have that capacity only in combination

with other circumstances. The standard definition of probable cause (*People* v. *Terry, supra*) necessarily implies that all the circumstances are to be considered. It permits the officer to take cognizance of the entire situation confronting him at the time and place of the search, including not only the intrinsic qualities of the object but also the peripheral circumstances attending its discovery. The probable cause concept serves to prevent arbitrary intrusions; it does not blind the officer to suspicion-arousing activities at the time and place of the search. The figurative person of ordinary care and prudence would be a fool if he were blinded to the ambient circumstances as a permissible source of probable cause.

When Deputy Nostrand opened the dresser drawer, he was engaged in a warrant-supported search for evidence of a specific burglary. Defendant entered the room, reached into the drawer, grabbed a book or notebook and left the room with it. According to the evidence, the officer had not picked up the book, had not examined it or recognized it as a diary. Defendant's flurry of activity might be ascribed to various motivations. A necessarily included possibility was an honest and strong suspicion that defendant feared discovery of the book or notebook because it contained or would lead to incriminating evidence concerning the very burglary which served as initial justification for the search. There was nothing arbitrary or baselessly intrusive in the officers' subsequent conduct. Rather, that conduct stemmed from an honest and strong suspicion that the book or notebook was evidence which would aid "in a particular apprehension or conviction." (*Warden* v. *Hayden, supra.*) Defendant's suspicion-arousing activity created a nexus between the seized item and the suspected burglary which had formed the original justification for the search warrant.

The law officers' activities extended beyond seizure of the diary and included a search of its contents to discover whether it contained incriminating entries. A diary represents a collection of entries made in expectation of privacy. All or many of these entries may be innocent. A random search of a diary in the hope of finding an incriminating entry arouses strong objections. (See *United States* v. *Bennett* (2d Cir. 1969) 409 F.2d 888, 897.) At the root of the objection is the random character of the search. "[A] random police search is the precise invasion of privacy which the Fourth Amendment was intended to prohibit." (*Mozetti* v. *Superior Court* (1971) 4 Cal.3d 699, 711 [94 Cal.Rptr. 412, 484 P.2d 84].) There was nothing random about the scrutiny of defendant's diary. When defendant snatched it, he created probable cause to believe that it

contained evidence of crime. Thus the officers were justified in sifting its contents.

Contrary to defendant's contention, evidentiary use of the diary did not violate the constitutional privilege against self-incrimination. The privilege does not prevent the otherwise lawful seizure of a document even when its contents are communicative. (*Andresen* v. *Maryland* (1976) 427 U.S. 463 [49 L.Ed.2d 627, 96 S.Ct. 2737]; *United States* v. *Dawson* (9th Cir. 1975) 516 F.2d 796, 806; *United States* v. *Bennett, supra,* 409 F.2d at p. 896; see also, *People* v. *Thayer* (1965) 63 Cal.2d 635, 638 [47 Cal.Rptr. 780, 408 P.2d 108].)

The trial court properly denied defendant's motion to suppress. The judgment is affirmed.

Puglia, P. J., and Evans, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 28, 1976.