[No. B071169. Second Dist., Div. Seven. Apr. 29, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR ANTHONY SANCHEZ, Defendant and Appellant.

## COUNSEL

Bruce Eric Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Cynthia G. Besemer and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—We are asked to decide this novel question: if a defendant's lawyer delivers inculpatory writings to the trial court, under seal, may the trial court furnish those writings to the prosecutor without violating either the defendant's privilege against self-incrimination or the reciprocal discovery statutes (Pen. Code,[1] §§ 1054-1054.7)? Our answer is yes. We affirm the first degree murder judgment.

### PROCEDURAL AND FACTUAL BACKGROUND

By information, Arthur Anthony Sanchez (appellant) was charged with the March 28, 1992, murder of Rufugia Limon Huerta. It was alleged he personally used a deadly weapon, a rope (§ 12022, subd. (b)). Appellant pleaded not guilty and denied the allegation.

On June 10, 1992, the prosecutor filed a motion with the trial court "to produce and . . . unseal documents in the custody of the county clerk." Defense counsel filed an opposition. On July 7, 1992, Superior Court Judge James H. Piatt, after hearing argument by counsel, granted the motion. Execution of the order was stayed to permit appellant to petition for a writ of prohibition. On August 5, 1992, Division Three of this court summarily denied appellant's petition. The next day, on August 6, 1992, Judge Piatt personally turned the subject writings over to the prosecutor.

Trial began on September 8, 1992. Jury deliberations began September 22, 1992, and later that day the jury found appellant guilty of first degree murder (§ 187) and found true the allegation he had personally used a deadly weapon, a rope. (§ 12022, subd. (b).) The trial court, Superior Court Judge Thomas F. Nuss, denied appellant's new trial motion and sentenced him to state prison for 26 years to life.

There being no insufficiency of evidence claim, we summarize the evidence. Our perspective favors the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

That appellant strangled Ruth[2] Huerta in his bedroom of his parents' house in the early afternoon of March 28, 1992, was not disputed. Appellant admitted as much before and during trial. In dispute was only the degree of his culpability.

Appellant and the victim began dating in October 1991 and some months later became engaged. But in late February or early March 1992 their

---

[1]Statutory references, unless otherwise noted, are to the Penal Code.

[2]The victim's friends called her Ruth, not Rufugia.

relationship became strained. Appellant was unemployed, lived with his parents, and was depressed. During a meeting with Ruth appellant became upset and shook her. She said she did not want to see him anymore. Appellant continued to telephone her, became angry, and called her names.

On March 28, 1992, the victim and her 16-year-old sister Roxanne planned to celebrate Roxanne's good grades by going shopping in the mall and then out to eat. But early that morning appellant called and told Roxanne he wanted to speak to Ruth. Informed she was in the bathroom, he called again. Ruth talked to appellant and they yelled at each other. Finally, Ruth agreed to briefly see appellant.

Before she left, around 1 p.m., Ruth told Roxanne to telephone her at appellant's house and say there was an emergency, otherwise appellant probably would not let her leave.

A little after 1 p.m. appellant's uncle arrived at appellant's house, saw Ruth's car in the driveway, and spoke briefly to appellant outside the house. The uncle left but returned in about 15 minutes, saw Ruth's car still in the driveway, talked to appellant for a few minutes outside the house, and left. He had not seen or heard Ruth. Appellant did not appear intoxicated to him; appellant seemed "normal."

Appellant's parents returned home about 5:30 p.m. and saw a note from appellant on the kitchen table. It stated: "Mom Dad I love you and I'm so sorry for what has happened. I love you. Please forgive me. I will call you. If anyone calls for Ruth, say that we went to Newport Beach."

A short time later appellant's married sister, Sherri Lucero, called her parents and asked if appellant's bedroom door was locked.[3] When told it was, she urged her parents to get into the room. They did. On the floor was an object wrapped in a tarp and covered by a blanket. Appellant's mother called 911.

The police arrived and found Ruth inside the blanket and tarp coverings, dead, strangled by a double looped rope around her neck. Her ankles, wrists, and elbows were bound with telephone cord.

Appellant, after killing Ruth, drove her car to a bank and used her automated teller machine (ATM) card to withdraw $200. Later, about 6:30 p.m., he drove to his sister Kathy's house and told her something bad had happened, that someone had been killed.

---

[3]The record does not disclose what information prompted Sherri Lucero's call. She testified that just prior to her call, her husband had received a telephone call.

The next day, March 29, 1992, accompanied by his sisters, appellant surrendered to the police.

Appellant testified that on March 28, 1992, he consumed quantities of alcohol and cocaine, argued with Ruth at his house, put a rope around *his* neck and then remembered sitting on the bedroom floor, looking up and seeing Ruth's eyes staring at him. He did not see the rope around her neck, he only saw her eyes. He was scared and, still seated, flipped the blanket over Ruth. He felt weak, hot, had difficulty standing up, ran around the house yelling, returned to the bedroom, and, in stumbling, pulled Ruth from the bed onto the floor. He tried to lift her in order to carry her to the car and get help but he could not lift her. So he tied her ankles together to lift her, but still could not. He did not remember tying her wrists and elbows and did not remember strangling her.

## DISCUSSION

A. *Did the trial court err in furnishing the inculpatory writings to the prosecutor?*

1. *The inculpatory writings.*

About a week after the offense, appellant's sisters Kathy and Sherri decided to air out appellant's bedroom and also to look for letters. They, along with appellant's parents, other relatives and friends began looking into the closets of his two bedrooms. In the middle bedroom, where Ruth's body had been found, Sherri saw a bag in the closet filled with magazines. Among the magazines were papers with appellant's writing.

In a back bedroom, also used by appellant, Sherri found other papers on the closet floor. Some were balled up. Others were in a little box. They also had appellant's writing.

The writings were of various sorts. Some were dated (Mar. 26 or Mar. 27 or Mar. 28), some were signed by appellant, and almost all referred to Ruth and appellant's feelings toward her. One dated "3/26" stated: "I don't want to hurt my girl but if she's not going to be mine, she won't be anyone else's either. Our love was meant to be *'Death do us Part'*."

Another stated that Saturday "could be the perfect opportunity, to follow through with what may very well be necessary. [¶] I really do wish that I had a gun, it would be so much easier and less painfull. Although if it needs to come to this, maybe pain should be felt?"

Still another appeared to be a murder checklist. On a three-and-one-half-by seven-and-one-half-inch piece of paper were the following numbered entries: "(1) strangle-stab[4] (2) enter into 4-ply gray plastic bags (3) seal bags thoroughly (4) empty trunk and line w/ blanket to place 4-ply into a cover with blanket. Check all oil, fluids, tires. (5) place two (5 gall.) gas containers in both corners of trunk (6) P. hills [?] ATM bogus deposit of $320[5] —/withdraw $200—try to write check to guerrero bail for $100 $200 (7) use credit card to fill gas tank and containers, purchase tire flat fix cans (9)[6] Roy (cocaine) (10) need two cocaine bullets to be able to snort and drive calmly and safely to Seattle.[7]"

### 2. *Transmission of the inculpatory writings.*

In a declaration filed with the trial court, the prosecutor described the transmission and delivery of the subject writings as follows. Sherri, appellant's sister, and other family members found the writings and gave them to Kathy Gonzales, another sister of appellant. She gave them to an attorney, Henry Gonzales. Mr. Gonzales gave them to a public defender investigator who gave them to appellant's attorney, Deputy Public Defender Henry Bastien. Mr. Bastien placed the writings in a sealed envelope, and without informing the prosecutor, delivered them to the clerk of the court.

The prosecutor learned of the writings from Sherri Lucero's husband who also told the prosecutor that appellant's sister Kathy had given them to the Attorney Henry Gonzales.

### 3. *Defense counsel's delivery of the inculpatory writings to the trial court.*

Although defense counsel did not explain why he delivered, under seal, the inculpatory writings to the trial court, case law suggests an explanation.

In *People* v. *Lee* (1970) 3 Cal.App.3d 514, 526 [83 Cal.Rptr. 715][8] the court stated it was " 'an abuse of a lawyer's professional responsibility knowingly to take possession of and secrete the instrumentalities of a

---

[4]The police recovered a knife from a drawer in the bedroom where the victim's body was found.

[5]Among the recovered papers was a filled out deposit slip for the victim's Wells Fargo account, complete except for a signature, dated March 28, 1992, in the amount of $324.94.

[6]There is no number (8).

[7]Appellant's former girlfriend Jane lived in Seattle. Other writings refer to contacting her.

[8]In *Lee*, almost mirroring the instant facts, the defendant's wife gave his bloody boots (the attempted murder weapons) to a public defender investigator who gave them to defendant's public defender attorney who gave them to a magistrate, notifying the prosecutor he had done so. The prosecutor ultimately obtained the boots with a search warrant.

crime.'" Its discussion made clear the responsibility extended to other physical evidence. (*Ibid.*) Defense counsel could withhold the physical evidence for a reasonable time to examine it but then "'should, as an officer of the court, on his own motion turn the same over to the prosecution.'" (*Ibid.*)

Our Supreme Court extended this responsibility in *People* v. *Meredith* (1981) 29 Cal.3d 682 [175 Cal.Rptr. 612, 631 P.2d 46]. In *Meredith* the victim was robbed and murdered. One of the defendants (Scott) told his lawyer he took "the victim's wallet, divided the money with Meredith, attempted to burn the wallet, and finally put it in the trash can." (*Id.* at p. 686.) The lawyer had his investigator retrieve the wallet from the trash can. "Counsel examined the wallet and then turned it over to the police." (*Ibid.*) The admissibility of the wallet was not in dispute but the testimony of the investigator who retrieved it was contested. Defendant (Scott) claimed the attorney-client privilege prevented the prosecution from calling the investigator and eliciting the *location* of the retrieved wallet.

Justice Tobriner, writing for a unanimous court, held "that whenever defense counsel removes or alters evidence, the statutory privilege does not bar revelation of the original location or condition of the evidence. . . ." (29 Cal.3d at p. 695.)

Justice Tobriner also referred to an attorney's responsibility when given evidence not by his client but third parties. He stated, "Two decisions, *People* v. *Lee* (1970) 3 Cal.App.3d 514 [83 Cal.Rptr. 715] and *Morrell* v. *State* (Alaska 1978) 575 P.2d 1200, held that an attorney must not only turn over evidence given him by *third parties*, but also testify as to the source of that evidence. Both decisions emphasized that the attorney-client privilege was inapplicable because the third party was not acting as an agent of the attorney or the client." (29 Cal.3d at p. 693, fn. 5, original italics.)

In *People* v. *Superior Court* (*Fairbank*) (1987) 192 Cal.App.3d 32 [237 Cal.Rptr. 158] the prosecutor learned from defendant's intercepted jail letter to another inmate that defendant's lawyer had possession of the murder weapons. When the trial court refused to order defense counsel to deliver them to the prosecutor, the prosecutor petitioned for a writ of mandate. In issuing the writ the court stated, "If counsel . . . chooses to . . . possess . . . physical evidence pertaining to the crime, counsel must immediately inform the court of the action." (*Id.* at pp. 39-40.) The court also noted this "legal obligation[] should be self-executing and no motion by the prosecution or order by the court should be required to enforce [it]." (*Id.* at p. 39.)

In delivering the inculpatory writings to the trial court defense counsel did no more[9] than his "legal obligation." (192 Cal.App.3d at p. 39.)

### 4. *Privilege against self-incrimination.*

██ The Fifth Amendment of the United States Constitution states "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." Appellant contends the trial court violated this provision by furnishing his inculpatory writings to the prosecutor. Appellant's sole authority is *Izazaga* v. *Superior Court* (1991) 54 Cal.3d 356 [285 Cal.Rptr. 231, 815 P.2d 304].

*Izazaga,* which upheld as constitutional the reciprocal discovery provisions (§ 1054 et seq.) of Proposition 115, did *not* involve a defendant's writings. (54 Cal.3d at p. 364, fn. 1.) ██ But in considering the petitioner's claim that the reciprocal discovery statutes violated his Fifth Amendment privilege, *Izazaga* stated: "Under cases of the Supreme Court, there are four requirements that together trigger this privilege: the information sought must be (i) 'incriminating'; (ii) 'personal to the defendant'; (iii) obtained by 'compulsion'; and (iv) 'testimonial or communicative in nature.' (See *United States* v. *Nobles* (1975) 422 U.S. 225 [45 L.Ed.2d 141, 95 S.Ct. 2160] . . . ; *Schmerber* v. *California* (1966) 384 U.S. 757, 761 [16 L.Ed.2d 908, 914, 86 S.Ct. 1826]; *Doe* v. *United States* (1988) 487 U.S. 201, 207 [101 L.Ed.2d 184, 194-195, 108 S.Ct. 2341].)[4]" (*Id.* at p. 366.) Footnote 4 stated: "These four requirements emanate directly from the wording of the self-incrimination clause: 'No person . . . shall be *compelled* in any criminal case to be a *witness against himself . . . .*' " (*Ibid.,* original italics.)

██ Appellant argues that each of these four requirements was satisfied. In making this argument appellant neither discusses the three cases cited by *Izazaga* (*Nobles, Schmerber,* and *Doe*) nor any other pertinent authority. We consider appellant's contention.

Three of the requirements cannot seriously be questioned: the writings, concededly, are *incriminating, personal to the defendant,* and *communicative in nature.*

As to the fourth, "obtained by 'compulsion'," appellant's entire argument consists of this: "they were obtained . . . by compulsion—i.e., they were obtained against appellant's will and over his objection."

Appellant is mistaken. He cites no authority for the proposition that a prosecutor obtains evidence *by compulsion* if the defendant objects to his obtaining that evidence. The law is otherwise.

---

[9]Whether, by delivering a sealed envelope without other notice or explanation to the trial court and without notice to the prosecutor, he did *less*—we are not asked to consider.

In *United States* v. *Nobles* (1975) 422 U.S. 225 [45 L.Ed.2d 141, 95 S.Ct. 2160], the first case cited by *Izazaga*, after the defense called its investigator as a witness, the defense was required to disclose its investigator's interview report of prosecution witnesses. Notwithstanding the defendant's objection, the high court stated, "Requiring their production from the investigator therefore would not in any sense compel [defendant] to be a witness against himself or extort communications from him." (*Id*. at p. 234 [45 L.Ed.2d at p. 150].)

In *Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826], the second case cited by *Izazaga*, the issue was not compulsion (it was clearly present) but rather whether the compulsion was *testimonial*. In upholding the taking of a blood sample from the defendant the court found it was not.

Before considering *Doe* v. *United States* (1988) 487 U.S. 201 [101 L.Ed.2d 184, 108 S.Ct. 2341], the third case cited by *Izazaga*, it is useful to note four of its antecedents.

In *Warden* v. *Hayden* (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642] the Supreme Court stated: "Nothing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities, fruits of crime, or contraband . . . . Privacy is disturbed no more by a search directed to a purely evidentiary object than it is by a search directed to an instrumentality, fruit, or contraband." (*Id*. at pp. 301-302 [18 L.Ed.2d at pp. 788-789].) *Warden* upheld the search and seizure of the defendant's cap and jacket and rejected the *Boyd* rule (*Boyd* v. *United States* (1886) 116 U.S. 616 [29 L.Ed. 746, 6 S.Ct. 524]) that " 'to permit them to be used in evidence would be, in effect . . . to compel the defendant to become a witness against himself.' " (*Warden* v. *Hayden, supra*, 387 U.S. at p. 302 [18 L.Ed.2d at p. 789].)[10]

In *Fisher* v. *United States* (1976) 425 U.S. 391 [48 L.Ed.2d 39, 96 S.Ct. 1569] taxpayers being investigated by the Internal Revenue Service (IRS)

---

[10]California anticipated *Warden* v. *Hayden* in *People* v. *Thayer* (1965) 63 Cal.2d 635 [47 Cal.Rptr. 780, 408 P.2d 108]. Justice Traynor, for a unanimous court, upheld a seizure of records, pursuant to a search warrant, against claims of Fourth and Fifth Amendment violations. He stated the prohibition against "mere evidence" was "impossible to understand." (*Id*. at p. 637.) He noted, "It has also been suggested that the rule protects privacy by preserving a man's most private papers from any scrutiny or seizure, however reasonable. . . . The difficulty with this rationale is that the rule protects, not private papers, but mere evidence. 'There is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure, if only they fall within the scope of the principles of the cases in which other property may be seized.' . . . Private papers that are the instruments of crime, such as a spy's code books . . . may be seized. Finally, it is impossible to sustain the mere evidence rule as a corollary of the privilege against self-incrimination. It is not limited to self-incriminating writings, and when such writings are

obtained documents from their accountants and, within the attorney-client relationship, transferred those documents to their lawyers. IRS served summonses on the lawyers, requiring them to produce the documents. The lawyers refused.

*Fisher* held: "The taxpayer's privilege under [the Fifth] Amendment is not violated by enforcement of the summonses involved in these cases because enforcement against a taxpayer's lawyer would not 'compel' the taxpayer to do anything—and certainly would not compel him to be a 'witness' against himself." (425 U.S. at p. 397 [48 L.Ed.2d at p. 47].)

Justice White made clear that the Fifth Amendment is not implicated just because communicative evidence is compelled. It is implicated only when the compulsion is against the defendant. Justice White stated: "The taxpayers' Fifth Amendment privilege is therefore not violated by enforcement of the summonses directed toward their attorneys. This is true whether or not the Amendment would have barred a subpoena directing the taxpayer to produce the documents while they were in his hands." (425 U.S. at p. 397 [48 L.Ed.2d at p. 48].) He added, *"This* personal privilege was in no way decreased by the transfer. It is simply that by reason of the transfer of the documents to the attorneys, those papers may be subpoenaed without compulsion on the taxpayer. The protection of the Fifth Amendment is therefore not available. 'A party is privileged from producing evidence but not from its production.'" (*Id.* at pp. 398-399 [48 L.Ed.2d at p. 49].)

*Fisher* also makes clear that not only must the "compulsion" be against the defendant but it must be the *testimony*—the *communication*—which is compelled. It states, "[T]he Court has never on any ground, personal privacy included, applied the Fifth Amendment to prevent the otherwise proper acquisition or use of evidence which, in the court's view, did not involve compelled testimonial self-incrimination of some sort.

"The proposition that the Fifth Amendment protects private information obtained without compelling self-incriminating testimony is contrary to the clear statements of this Court that under appropriate safeguards private incriminating statements of an accused may be overheard and used in

---

obtained by seizure, instead of by subpoena, the defendant does not impliedly admit their genuineness. . . . Moreover, the papers are no less self-incriminating when they can be classified as contraband, instruments of crime, or fruits of crime.

"In California, the mere evidence rule is rejected by statute. (Pen. Code, § 1524, subd. 4)." (63 Cal.2d at p. 638, internal citations omitted.) (See also *People* v. *Trujillo* (1948) 32 Cal.2d 105 [194 P.2d 681] [The prosecution obtained defendant's clothing and introduced expert testimony that it matched fibers found on the deceased victim's body. Fifth Amendment claim rejected].)

evidence, if they are not compelled at the time they were uttered, *Katz* v. *United States*, 389 U.S. 347, 354, [19 L.Ed.2d 576, 583-584, 88 S.Ct. 507] (1967); *Osborn* v. *United States*, 385 U.S. 323, 329-330 [17 L.Ed.2d 394, 399-400, 87 S.Ct. 429] (1966); and *Berger* v. *New York*, 388 U.S. 41, 57 [18 L.Ed.2d 1040, 1051, 87 S.Ct. 1873] (1967); cf. *Hoffa* v. *United States*, 385 U.S. 293, 304 [17 L.Ed. 2d 374, 383, 87 S.Ct. 408]; and that disclosure of private information may be compelled if immunity removes the risk of incrimination. *Kastigar* v. *United States*, 406 U.S. 441 [32 L.Ed.2d 212, 92 S.Ct. 1653] (1972). If the Fifth Amendment protected generally against the obtaining of private information from a man's mouth or pen or house, its protections would presumably not be lifted by probable cause and a warrant or by immunity. The privacy invasion is not mitigated by immunity; and the Fifth Amendment's strictures, unlike the Fourth's, are not removed by showing reasonableness. The Framers addressed the subject of personal privacy directly in the Fourth Amendment. They struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant to search and seize will issue. They did not seek in still another Amendment—the Fifth—to achieve a general protection of privacy but to deal with the more specific issue of compelled self-incrimination." (425 U.S. at pp. 399-400 [48 L.Ed.2d at pp. 49-50].)

*Andresen* v. *Maryland* (1976) 427 U.S. 463 [49 L.Ed.2d 627, 96 S.Ct. 2737] found no violation of the Fifth Amendment in the seizure of business records, including those written by defendant. The issue was framed this way: "There is no question that the records seized from petitioner's offices and introduced against him were incriminating. Moreover, it is undisputed that some of these business records contain statements made by petitioner. . . . The question, therefore, is whether the seizure of these business records, and their admission into evidence at his trial, compelled petitioner to testify against himself in violation of the Fifth Amendment." (*Id* . at p. 471 [49 L.Ed.2d at p. 637], internal citations omitted.)

In answering no, the court explained that "petitioner was not asked to say or to do anything. The records seized contained statements that petitioner had voluntarily committed to writing. The search for and seizure of these records were conducted by law enforcement personnel. Finally, when these records were introduced at trial, they were authenticated by a handwriting expert, not by petitioner. Any compulsion of petitioner to speak, other than the inherent psychological pressure to respond at trial to unfavorable evidence, was not present.

"This case thus falls within the principle stated by Mr. Justice Holmes: 'A party is privileged from producing the evidence but not from its production.'

*Johnson* v. *United States*, 228 US 457, 458 [57 L.Ed. 919, 920, 33 S.Ct. 572]." (427 U.S. at p. 473 [49 L.Ed.2d at p. 638].)

*Andresen*, like *Fisher*, concludes that no Fifth Amendment violation occurs when a defendant, without being compelled to do so, makes a writing and the government, without compelling the *defendant* to produce the writing, obtains that writing.

In *United States* v. *Doe* (1984) 465 U.S. 605 [79 L.Ed.2d 552, 104 S.Ct. 1237], there was little left to decide. A grand jury investigating corruption served respondent with five subpoenas for specified business records. In accordance with *Fisher* and *Andresen*, the court rejected any Fifth Amendment claim based upon the content of the documents. The court stated, "Where the preparation of business records is voluntary, no compulsion is present."[11] (*United States* v. *Doe, supra*, 465 U.S. at p. 610 [79 L.Ed.2d at p. 559].) It also rejected the argument that a "zone of privacy" protects private papers from compelled production. (*Id.* at p. 610, fn. 8 [79 L.Ed.2d at p. 559].)

In the third case cited by *Izazaga, Doe* v. *United States* (1988) 487 U.S. 201 [101 L.Ed.2d 184, 108 S.Ct. 2341] (a related case to *United States* v. *Doe, supra*), the Supreme Court held that compelling Doe to execute a form authorizing disclosure of his records was *not* violative of the Fifth Amendment. (*Id.* at p. 206 [101 L.Ed.2d at p. 194].) Although the records were clearly communicative and Doe was compelled to authorize their disclosure, the compelled *act* of authorization was not "testimonial" within the meaning of the Fifth Amendment. (See also *SEC* v. *Jerry T. O'Brien, Inc.* (1984) 467 U.S. 735, 742 [81 L.Ed.2d 615, 621-622, 104 S.Ct. 2720].)

Accordingly, if a defendant, without being compelled to do so, creates inculpatory writings and the government obtains them without compelling the defendant to authenticate or vouch for those writings, the Fifth Amendment is not violated. (*People* v. *Thayer, supra*, 63 Cal.2d 635, 638; *Fisher* v. *United States, supra*, 425 U.S. 391; *Andresen* v. *Maryland, supra*, 427 U.S. 463; *United States* v. *Doe, supra*, 465 U.S. 605; *SEC* v. *Jerry T. O'Brien,*

---

[11]The court repeated this holding: "Respondent does not contend that he prepared the documents involuntarily or that the subpoena would force him to restate, repeat, or affirm the truth of their contents. The fact that the records are in respondent's possession is irrelevant to the determination of whether the creation of the records was compelled." (465 U.S. at pp. 611-612 [79 L.Ed.2d at pp. 559-560].) Also: "If the party asserting the Fifth Amendment privilege has voluntarily compiled the document, no compulsion is present and the contents of the document are not privileged." (*Id.* at p. 612, fn. 10 [79 L.Ed.2d at p. 560].)

In her concurring opinion, Justice O'Connor was even more emphatic: ". . . the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind." (465 U.S. at p. 618 [79 L.Ed.2d at p. 563].)

*Inc., supra*, 467 U.S. 735; *United States* v. *Moody* (11th Cir. 1992) 977 F.2d 1425 [defendant's personal writings and his jail cell oral communications properly seized and admitted]; *People* v. *Miller* (1976) 60 Cal.App.3d 849 [131 Cal.Rptr. 863] [defendant's diary properly admitted]; *State* v. *Barrett* (Iowa 1987) 401 N.W.2d 184 [Iowa Supreme Court held no violation of Fifth Amendment in admitting defendant's 143-page personal journal]; *State* v. *Andrei* (Me. 1990) 574 A.2d 295 [Maine Supreme Court held defendant's diary admissible]; see generally, 1 LaFave, Search & Seizure (2d ed. 1987) §§ 2.6(d) and 2.6(e), pp. 487-494; 8 Wigmore, Evidence (McNaughton rev. 1961) §§ 2263, 2264, pp. 378-386; Burkoff, Search Warrant Law Deskbook, § 18.3, pp. 18-12, 18-13; Note (1977) 76 Mich.L.Rev. 184, 206-211; Note (1977) 90 Harv.L.Rev. 945; McCormick, Evidence (3d ed. 1984) §§ 125-127, pp. 304-311; see also *People* v. *Sirhan* (1972) 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121] [defendant's private journals properly admitted but Fifth Amendment not addressed]; *People* v. *Frank* (1985) 38 Cal.3d 711 [214 Cal.Rptr. 801, 700 P.2d 415] [search warrant for defendant's diary invalid because affidavit failed to provide probable cause the diary existed and was present at the search location].)

There is nothing in *Izazaga* to suggest disagreement with this settled proposition. To the contrary, *Izazaga* expressly adopts it. It states, "[P]etitioner's argument misinterprets the scope of the self-incrimination clause, which 'protects a person only against being *incriminated by his own compelled testimonial communications.*' " (*Izazaga* v. *Superior Court, supra*, 54 Cal.3d at p. 366, original italics.)

 We conclude that because appellant voluntarily created the subject writings and the prosecutor obtained them from the trial court, not appellant, there was no violation of appellant's privilege against self-incrimination.

5. *The reciprocal discovery statutes (§ 1054 et seq.)*

 The linchpin of appellant's next contention is this statement in *In re Littlefield* (1993) 5 Cal.4th 122, 129 [19 Cal.Rptr.2d 248, 851 P.2d 42]:[12] "In criminal proceedings, under the reciprocal discovery provisions of section 1054 et seq., all court-ordered discovery is governed exclusively by—and is barred except as provided by—the discovery chapter newly enacted by Proposition 115. (§§ 1054, subd. (e), 1054.5, subd. (a).)"

Appellant, based upon this language, argues: "In order to determine whether the discovery of appellant's writings was lawful, consequently, the

---

[12]*Littlefield* held lawful a trial court order requiring defense counsel to contact a likely defense witness in order to acquire her address for disclosure to the prosecution. (5 Cal.4th at p. 137.) For technical reasons it invalidated the trial court's order holding defense counsel in contempt for noncompliance.

four corners of the new discovery scheme must be scrutinized. If such discovery was not authorized by the latter scheme, then it was 'barred.' "

Appellant then proceeds to "scrutinize" the statute, readily concluding the subject "discovery" is outside section 1054.3.[13] (Respondent concedes as much.) Appellant then turns to section 1054.4, relied upon by the trial court and respondent, which provides: "Nothing in this chapter shall be construed as limiting any law enforcement or prosecuting agency from obtaining nontestimonial evidence to the extent permitted by law on the effective date of this section."

Appellant concedes this section authorizes a prosecuting agency to obtain "*non*testimonial evidence" outside the "four corners" of the discovery statutes but *only* "nontestimonial evidence."

Finally, appellant concludes that because the subject writings are communicative (citing *Schmerber* v. *California, supra,* 384 U.S. 757) and contain factual assertions they are "testimonial" and therefore *not* authorized by section 1054.4.

We find the contention a sophism. It is erroneously based upon the notion that the prosecutor's motion was a "discovery" motion to which the reciprocal discovery statutes applied. It was not.

To return to the linchpin language of *Littlefield*: "In criminal proceedings, under the *reciprocal* discovery provisions of section 1054 et seq., all court-ordered *discovery* is governed exclusively by—and is barred except as provided by—the discovery chapter . . . ." (5 Cal.4th at p. 129, italics added.)

The statute makes clear the meaning of "discovery" in its statement of purposes: "To save court time by requiring that discovery be conducted informally *between and among the parties* before judicial enforcement is requested." (§ 1054, subd. (b).)

In making its motion, the prosecutor sought no evidence from appellant, testimonial or nontestimonial. The evidence sought by the prosecutor was

---

[13]The section reads: "The defendant and his or her attorney shall disclose to the prosecuting attorney:

"(a) The names and addresses of persons, other than the defendant, he she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of experts made in connection with the case, and including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant intends to offer in evidence at the trial.

"(b) Any real evidence which the defendant intends to offer in evidence at the trial."

possessed by the trial court (*not* a "party") and it was from the trial court the prosecutor sought and obtained it.[14]

In rejecting a similar "four corners scrutiny" argument, *People* v. *Superior Court (Broderick)* (1991) 231 Cal.App.3d 584, 594 [282 Cal.Rptr. 418], stated, "Proposition 115 discovery procedures apply only to discovery between the People and the defendant. They are simply inapplicable to discovery from third parties." (See also 5 Witkin & Epstein, Cal. Criminal Law (1993 Supp.) § 2498D, pp. 16-17.)

We add these brief observations. In delivering the writings to the court, appellant makes no claim that *he* acted pursuant to the reciprocal discovery statutes. Yet by that delivery, and dispossession, he would foreclose not only reciprocal "discovery" but "normal investigative efforts." (5 Witkin & Epstein, Cal. Criminal Law, *supra*, § 2498D, p. 17.)

Additionally, appellant makes no claim that by granting the prosecutor's motion the trial court ordered *appellant* to disclose anything, testimonial or nontestimonial.

Finally, we note that as used in section 1054.4 the writings, although communicative, were "nontestimonial." The section "makes clear that it is not directed at normal investigative efforts of law enforcement agencies." (5 Witkin & Epstein, Cal. Criminal Law, *supra*, § 2498D, p. 17.) Seizing murder checklists and diaries containing evidence *are* normal investigative efforts. (See, e.g., *People* v. *Miller, supra*, 60 Cal.App.3d 849; 1 LaFave, Search & Seizure, *supra*, §§ 2.6(d) and 2.6(e), pp. 487-494.) In concluding otherwise appellant misreads *Schmerber* v. *California, supra*, 384 U.S. 757, and *Doe* v. *United States, supra*, 487 U.S. 201.

In *Schmerber* the issue was whether *compelling* a defendant to give a blood sample was "testimonial" and thus violative of the Fifth Amendment. In *Doe* the issue was whether *compelling* Doe to execute consent bank disclosure forms was "testimonial." (*Doe* held it was not.) Similarly, when the issue involved compelling a defendant to *do* something (give a handwriting exemplar, try on a jacket, make sounds) courts have determined whether the *compelled* act is "testimonial." (See *Doe* v. *United States, supra*, 487 U.S. at pp. 210-211 [101 L.Ed.2d at p. 197].) Implicit in such use of "testimonial" is "compulsion." It is in that sense that the term is used in section 1054.4. (See *United States* v. *Moody, supra*, 977 F.2d 1145; *Fisher* v. *United States, supra*, 425 U.S. 391, 399-400 [48 L.Ed.2d 39, 49-50].) As we have noted,

---

[14]In granting the prosecutor's motion the trial court stated, "*I* am now going to turn the documents over to [the prosecutor]."

voluntarily created writings do not involve compelled testimony. (See also Evid. Code, § 140: [" 'Evidence' means *testimony, writings*, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact."]; *Stern* v. *Superior Court* (1947) 78 Cal.App.2d 9, 13 [177 P.2d 308] ["All evidence is not testimony. Testimony is limited to that sort of evidence which is given by witnesses speaking under oath or affirmation".]). Appellant's contention that "every written . . . statement . . . is necessarily testimonial" was explicitly rejected by *Doe* v. *United States, supra,* 487 U.S. 201, 208-209 [101 L.Ed.2d 184, 196].

In holding the trial court properly furnished the inculpatory writings to the prosecutor[15] we implement the purpose of the reciprocal discovery statutes: "To promote the ascertainment of truth in trials . . . ." (§ 1054, subd. (a).) As Justice Powell observed in *United States* v. *Nobles*: " 'The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.' " (*United States* v. *Nobles, supra,* 422 U.S. 225, 231 [45 L.Ed.2d 141, 149].)[16]

B. *Reasonable Doubt.*

Appellant contends the trial court erred in giving the standard reasonable doubt instruction. (CALJIC No. 2.90.) We disagree.

The California Supreme Court (*People* v. *Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People* v. *Johnson* (1992) 3

---

[15]Since appellant did not retain possession of the inculpatory writings we need not consider whether, had they been retained, they were "discoverable" after appellant waived his privilege against self-incrimination by testifying (inconsistently with those writings).

[16]We find the dissent curious. It does not explain how or why *unprivileged*, highly relevant evidence may be concealed from a jury if only the defendant can transfer it to a court before the prosecution seizes it. Instead, the dissent chooses to: (1) erroneously claim our holding depends upon a defense counsel duty to relinquish the evidence (a *non*issue because defense counsel *did* relinquish the evidence) and (2) ignore binding United States Supreme Court and California Supreme Court authority that unvouched for, voluntarily created writings are *not* testimonial.

The dissent does not suggest the prosecutor could not have obtained the writings while they were in appellant's closet (e.g., by search warrant) or when appellant's sister Sherri had them or when appellant's sister Kathy had them or when Attorney Henry Gonzales had them or when a public defender investigator had them. But somehow, according to the dissent, by transferring possession of this *unprivileged*, highly relevant evidence to a court it became concealable! We think the dissent should explain its curious notion that courts are safe burial grounds of the truth.

Cal.4th 1183, 1234 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Sandoval* (1992) 4 Cal.4th 155, 185-186 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People* v. *Noguera* (1992) 4 Cal.4th 599, 633-634 [15 Cal.Rptr.2d 400, 842 P.2d 1160]) and the United States Supreme Court (*Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239]) have both found CALJIC No. 2.90 constitutional.

C. *CALJIC Nos. 2.03 and 2.62.*

■ Appellant contends the trial court erred in giving a consciousness of guilt instruction (CALJIC No. 2.03).[17] We disagree.

It was for the jury to determine whether the note appellant left for his parents and some of his statements to Detective Reed were "false or deliberately misleading." If the jury found them so, CALJIC No. 2.03 provided appropriate legal guidance. (See *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 127-127 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Kelly* (1992) 1 Cal.4th 495 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *People* v. *Liss* (1950) 35 Cal.2d 570, 576 [219 P.2d 789]; *People* v. *Waller* (1939) 14 Cal.2d 693, 702 [96 P.2d 344].)

■ Appellant also contends the trial court erred in giving CALJIC No. 2.62[18] (failure to deny or explain evidence). We disagree.

The instruction, *if* justified by the evidence, does not violate a defendant's privilege against self-incrimination, deny him the presumption of innocence, nor violate due process. (*People* v. *Saddler* (1979) 24 Cal.3d 671, 678 [156 Cal.Rptr. 871, 597 P.2d 130].)

When a defendant testifies but fails to deny or explain inculpatory evidence or gives a "bizarre or implausible" explanation, the instruction is

[17]The instruction reads: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

[18]The instruction reads: "In this case defendant has testified to certain matters.

"If you find that defendant failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable.

"The failure of a defendant to deny or explain evidence against him does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.

"If a defendant does not have the knowledge that he would need to deny or to explain evidence against [him,] it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence."

proper. (*People* v. *Mask* (1986) 188 Cal.App.3d 450, 455 [233 Cal.Rptr. 181]; see also *People* v. *Belmontes* (1988) 45 Cal.3d 744, 784 [248 Cal.Rptr. 126, 755 P.2d 310].) "[T]he applicability of CALJIC No. 2.62 is peculiarly dependent on the particular facts of the case." (*People* v. *Roehler* (1985) 167 Cal.App.3d 353, 393 [213 Cal.Rptr. 353].)

Appellant testified, failed to deny or explain inculpatory evidence, and gave a bizarre and implausible explanation. We cite only some of the many examples.

Appellant gave detailed and specific testimony about his prolific consumption of alcohol and cocaine during the afternoon of March 28, 1992, but had no memory of inculpatory events during that same afternoon: he did not remember tying the victim's wrists and elbows; he did not remember double-looping the rope around the victim's neck and strangling her; he did not remember *seeing* the noose around the victim's neck after he had strangled her (he saw only her "eyes"); although too weak to lift the victim appellant did not explain how she was found wrapped in a tarp and then covered by a blanket; although appellant testified he called out for help and looked for neighbors to assist the victim, he did not explain why he then drove the victim's car to withdraw $200—and did *not* seek help for her; and appellant failed to explain what appeared to be his murder checklist.

The trial court properly gave CALJIC No. 2.62.

### DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent from the majority's holding the defendant's diary was properly turned over to the prosecution.

The majority affirms the trial court's order releasing the diary to the prosecution on a ground not raised in the parties' briefs: defense counsel had a duty to voluntarily disclose the diary anyway. (Maj. opn., *ante*, at pp. 1018-1020.) Government Code section 68081 provides, "Before . . . a court of appeal . . . renders a decision in a proceeding . . . based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party." In their briefs,

the parties focused exclusively on the issues of whether disclosure of the diary was permissible under the criminal discovery statutes (Pen. Code, §§ 1054-1054.7)[1] and whether its disclosure to the prosecution would violate defendant's privilege against self-incrimination.[2] If the majority believes the trial court's order may be upheld on the ground defense counsel had an ethical duty to disclose the diary to the prosecution, then it is bound by statute as well as fundamental fairness to order a rehearing on that issue.

I would join the majority in issuing such an order because I am not convinced the issue is as cut-and-dried as the majority seems to believe. While the cases cited by the majority are surely on point they are not dispositive. *People* v. *Meredith* (1981) 29 Cal.3d 682 [175 Cal.Rptr. 612, 631 P.2d 46] did not involve the duty of a defense attorney to voluntarily turn over incriminating evidence to the state. While the court suggests in dictum such a duty exists in certain circumstances, it does not follow all such evidence should be disclosed in all circumstances. (*Id.* at p. 693, fn. 7.) *People* v. *Superior Court* (*Fairbank*) (1987) 192 Cal.App.3d 32, 39-40 [237 Cal.Rptr. 158] stated defense counsel must immediately inform the trial court when choosing to remove, possess, or alter *physical* evidence pertaining to the crime and the court must then take appropriate action to ensure the prosecution has timely access to the evidence. The evidence in *Fairbank* was the purported murder weapon which the defense counsel allegedly obtained from the defendant—factors which may distinguish *Fairbank* from the case before us. (See discussion below.) Finally, *People* v. *Lee* (1970) 3 Cal.App.3d 514 [83 Cal.Rptr. 175], was a case in which the evidence was seized pursuant to a warrant from a third party who was holding it for safekeeping under an agreement between defense counsel and the prosecutor. The only similarity between *Lee* and the present case is that the evidence, defendant's bloodstained boots, again an item of physical evidence, was given to defense counsel by a third party.

All three cases relied upon by the majority involved physical evidence of the crime: in *Meredith*, the victim's wallet; in *Fairbank*, the alleged murder weapon; in *Lee* the boots with which the defendant allegedly tried to kick the victim to death. I, for one, would like to hear argument on whether the defendant's private thoughts committed to paper are analogous to the evidence in the above cases. I would also like to hear argument on the ramifications of a holding incriminating writings must be voluntarily turned over to the prosecution. Would an attorney defending a tax evasion or other

---

[1]Unless otherwise indicated to the contrary, all future references are to the Penal Code.

[2]I agree with the majority's conclusion disclosure of the diary is not barred by the privilege against self-incrimination. However, for reasons I express below, I disagree the diary is discoverable under section 1054 et seq.

white-collar crime involving hundreds or even thousands of documents have to make a determination as to each page of each document whether it should be revealed to the prosecution? What would the ramifications of such a rule be on the defendant's right to effective assistance of counsel?[3]

Although *Lee* involved evidence given to defense counsel by a third party, the court did not focus on the significance of that fact. I would like to hear argument on the consequences of a policy of revealing to the prosecutor information received in confidence from a third party. What effect would such a policy have on the willingness of third parties to come forward with evidence which might be helpful to the defense? What would be the effect on the defense attorney's willingness to receive such evidence? Will the mere risk that such evidence may turn out to be incriminating be sufficient to convince attorneys to adopt an attitude of calculated ignorance?

Before holding defense counsel owed a duty to voluntarily turn over defendant's diary to the prosecution, a duty which the trial court merely facilitated counsel in meeting, we should hear argument on the foregoing questions and other relevant considerations the parties may choose to bring to our attention.[4]

The majority also concludes the criminal discovery statutes do not apply to this case because the diary was in the possession of the court, not defense counsel, and the criminal discovery statutes are inapplicable to third parties. The majority further concludes even if the criminal discovery statutes were

---

[3]If, as the majority asserts, California law clearly holds that once defense counsel accepted the diary from defendant's sister he had a duty to turn it over to the prosecutor, we should also request additional briefing on the issue of whether defendant was denied effective assistance of counsel.

[4]The majority misconstrues the basis of my dissent on this issue. (See maj. opn. fn. 16, *ante*, at p. 1028.) It is not my view that courts, any more than law offices, should be "safe burial grounds of the truth." (Cf. *People* v. *Lee, supra,* 3 Cal.App.3d at p. 526, quoting from *State* v. *Olwell* (1964) 64 Wn.2d 828 [394 P.2d 681, 684-685, 16 A.L.R.3d 1021].) It *is* my view Government Code section 68081 means what it says: no matter how convinced the court is that it has reached the correct legal conclusion on an issue, if that issue has not been briefed by the parties they must be afforded the opportunity to present their views on the matter through supplemental briefing. Thus, contrary to the view expressed by the majority in footnote 16, it not up to the *dissent* to explain why defendant's diary should not have been turned over to the prosecution. It is up to *counsel* on appeal to explain why the evidence should or should not have been turned over to the prosecutor.

The majority seeks to avoid a rehearing on this issue by claiming defense counsel's duty to relinquish the evidence is not the basis of its holding and, in any event, this is a nonissue because defense counsel did relinquish the evidence. If I mistook the lengthy discussion of an attorney's duty to turn over evidence (maj. opn., *ante,* at pp. 1018-1020) for a holding when it was merely dictum, I stand corrected. For the record, however, I would note it is clear defense counsel did not relinquish the evidence to the *prosecution* or there would have been no need for the prosecution to file a motion to produce.

applicable the diary was discoverable as "nontestimonial evidence" pursuant to section 1054.4. I respectfully disagree with both conclusions.

Although defense counsel did not explain why he delivered the diary to the trial court under seal, he did state to the court during argument on the prosecutor's motion to produce, "[W]e lodged those papers with the court in a sealed condition. We, the defense, did for safekeeping for the defense." I conclude from this statement defense counsel did not intend to surrender possession to the court, but to retain constructive possession of the documents anticipating a hearing on their discoverability at some future time. Furthermore, the transcript of the hearing on the People's motion to produce clearly shows the court and the parties were operating on the assumption the criminal discovery rules applied and that the issue was whether the documents were discoverable under section 1054.4 which provides, "Nothing in this chapter shall be construed as limiting any law enforcement or prosecuting agency from obtaining *nontestimonial* evidence to the extent permitted by law on the effective date of this section." (Italics added.)

Section 1054.4 does not authorize discovery of statements made by the defendant in his personal diary because such evidence is *testimonial* in character. In *Izazaga* v. *Superior Court* (1991) 54 Cal.3d 356, 367 [285 Cal.Rptr. 231, 815 P.2d 304] the court held with respect to the disclosure of defense witnesses' statements under section 1054.3, subdivision (a): "clearly such statements are 'testimonial or communicative in nature.' " If statements made by the defendant's witnesses are "testimonial or communicative in nature" then surely so are statements made by the defendant himself.

My analysis, however, does not rest on *Izazaga* alone. On the question of what constitutes testimonial evidence, *Izazaga* cited *Schmerber* v. *California* (1966) 384 U.S. 757, 761 [16 L.Ed.2d 908, 914, 86 S.Ct. 1826]. There, the United States Supreme Court held the privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature . . . ." The court went on to explain the term "testimonial" "relates only to acts on the part of the person to whom the privilege applies." (*Id.* at p. 761, fn. 5 [16 L.Ed.2d at p. 914].) The court concluded requiring defendant to submit to a blood test did not violate his privilege against self-incrimination. "Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone." (*Id.* at p. 765 [16 L.Ed.2d 908, 916], fn. omitted.) Later the same term the court equated testimonial evidence with the disclosure of "knowledge [defendant] might have." (*United States* v. *Wade* (1967) 388 U.S. 218, 222 [18 L.Ed.2d

1149, 1155, 87 S.Ct. 1926].) More recently, the court held ". . . in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information," be an "expression of the contents of an individual's mind," "reveal, directly or indirectly, his knowledge of facts relating him to the offense or . . . share his thoughts and beliefs with the Government." (*Doe* v. *United States* (1988) 487 U.S. 201, 210 & fn. 9, 213 [101 L.Ed.2d 184, 197, 198-199, 108 S.Ct. 2341].)

In contrast, nontestimonial evidence consists of such things as fingerprints, blood and urine samples, appearances in lineups and handwriting and voice exemplars. (See *People* v. *Collie* (1981) 30 Cal.3d 43, 55, fn. 7 [177 Cal.Rptr. 458, 634 P.2d 534], citing cases.) The purpose of section 1054.4 was to ensure such nontestimonial evidence, which was discoverable prior to enactment of the discovery provisions of chapter 10, would continue to be discoverable.

The fact the accused has committed his thoughts and knowledge to paper does not make this paper discoverable as "nontestimonial" real or physical evidence. Testimonial evidence is not limited to oral statements. In *Doe* v. *United States, supra,* 487 U.S. 201, the court observed, "There are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts. The vast majority of verbal statements thus will be testimonial and, to that extent at least, will fall within the privilege [against self-incrimination]." (487 U.S. at pp. 213-214 [101 L.Ed.2d at p. 199], fn. omitted; see also *Gilbert* v. *California* (1967) 388 U.S. 263, 266-267 [18 L.Ed.2d 1178, 1182-1183, 87 S.Ct. 1951] in which the court drew a distinction, for purposes of determining what is testimonial evidence, between the defendant's handwriting and "the content of what is written . . . .")

If, as respondent contends, a defendant's knowledge or thoughts about some aspect of the crime are discoverable under section 1054.4 merely because they exist on a piece of paper, then all writings by anyone with knowledge or thoughts about the crime, whether or not a prospective witness, would be discoverable under section 1054.4. Section 1054.3, which restricts discovery of written statements to those of witnesses, other than defendant, whom defendant intends to call at trial, would be meaningless. Such an interpretation would contravene the well-established rule a statute should be construed so as to give effect to all its provisions, not so that one section will destroy another. (*Rodriguez* v. *Superior Court* (1993) 14 Cal.App.4th 1260, 1269 [18 Cal.Rptr.2d 120].) Furthermore, by excluding the defendant's statements from discovery under section 1054.3 the drafters of Proposition 115 sought to avoid entangling Fifth Amendment issues in the

authorization of prosecutorial discovery. (*Izazaga* v. *Superior Court, supra*, 54 Cal.3d at p. 368.) Interpreting section 1054.4 as urged by the majority would judicially engraft onto the statute authorization for discovery of the very statements the drafters intended to exclude under section 1054.3.

If, as the prosecution argued, defendant's diary contained his plans for the murder of Ms. Huerta, disposal of her body, and escape from detection and capture then it clearly reveals his knowledge of the crime and facts relating him to the offense. Therefore, the diary is "testimonial" evidence under the authorities cited above.

A petition for a rehearing was denied May 19, 1994. Johnson, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied July 28, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.