**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Walter Leroy MOODY, Jr.,**
**Defendant–Appellant.**

No. 91–8780.

United States Court of Appeals,
Eleventh Circuit.

Nov. 6, 1992.

Edward D. Tolley, Athens, Ga., for defendant-appellant.

Howard M. Shapiro, U.S. Attorney's Office, S.D.N.Y., New York City, for plaintiff-appellee.

Before ERVIN *, Chief Judge, HALL *, Circuit Judge, and BUTZNER *, Senior Circuit Judge.

* Honorable Sam J. Ervin, III, Chief U.S. Circuit Judge, Honorable K. K. Hall, U.S. Circuit Judge, and Honorable John D. Butzner, Jr., Senior U.S. Circuit Judge, all of the Fourth Circuit, sitting by designation.

ERVIN, Chief Judge:

In 1989, Walter Leroy Moody, Jr. sent homemade package bombs to United States Circuit Judge Robert S. Vance in Birmingham, Alabama and civil rights attorney Robert E. Robinson in Savannah, Georgia. The packages detonated upon opening, killing both men. Moody was convicted in the Northern District of Georgia of numerous crimes related to the murders. Moody now appeals his 71 convictions on various grounds. We affirm.

I.

Moody was indicted for the bombings and related activities on November 7, 1990. The entire Northern District of Georgia court recused itself from the case, and Chief Justice William H. Rehnquist designated the late Senior Judge Edward J. Devitt, District of Minnesota, to preside over the case. Judge Devitt granted Moody's motion for a change of venue and transferred proceedings to the District of Minnesota. 762 F.Supp. 1485. Trial began on June 4 and concluded on June 28, 1991.

In the government's case-in-chief, it presented evidence demonstrating the following. In May 1972, a bomb exploded in Moody's residence in Macon, Georgia. The bomb, contained in a package addressed to a car dealer who had repossessed Moody's car, exploded when opened by Moody's wife. Moody was convicted in federal court in Macon for possessing the bomb, although he was acquitted of manufacturing it, and he served three years in federal prison.

Moody eventually became obsessed with overturning his 1972 conviction. He devised an elaborate story to shift the blame to a mythical "Gene Wallace," who Moody had claimed at trial had been attempting to assist him in regaining possession of his car and was responsible for the bomb. Moody recruited a witness to substantiate his account, a destitute, young handicapped woman, Julie Linn-West, and he paid her in small monthly installments as she learned her fabricated story. Moody petitioned for a Writ of Error Coram Nobis, seeking to overturn his 1972 conviction. A district court denied his petition and then this court, by a panel of Judges Kravitch, Morgan and Cox, affirmed the denial in June 1989. This court denied rehearing *en banc* in August 1989.

Soon after this court denied Moody's appeal, as the government aptly states in its brief, "Moody began to prepare to do battle with the Eleventh Circuit Court of Appeals." Brief at 6. Moody first attempted to produce deadly war gases. Moody dispatched his girlfriend, later wife, Susan McBride, whom he had physically and emotionally abused for over nine years, on a series of journeys to purchase the items needed. Moody was unsuccessful in producing the gases, and instead constructed and mailed a tear-gas package bomb to the NAACP Regional Office in Atlanta. The bomb exploded on August 21, 1989 and engulfed NAACP employees in clouds of choking gas. That day Moody sent out a "Declaration of War" to this court and television stations across the country. These letters accused this court of deliberate misconduct and "rank bias," and threatened poison gas attacks against American cities.

Emboldened by his bombing, Moody began constructing explosive devices for use against this court and others in the fall of 1989. He again sent McBride on various missions and was able to get his friend Ted Banks, in Titusville, Florida, to do the basic metalwork that was required to construct the pipe bombs to Moody's precise specifications. Moody constructed four powerful package bombs.

On December 14, 1989, Moody sent the first package to Judge Vance's home in Mountainbrook, Alabama. This package bore the return address of Judge Vance's colleague, Judge Lewis Morgan. Over the next two days, Moody sent bombs to the Jacksonville Branch of the NAACP, Robert E. Robinson, and this court's Clerk's Office. The first bomb detonated late in the afternoon of December 16, when Judge Vance opened the box addressed to him. Judge Vance was killed almost instantly; his wife, Helen Vance, was seriously injured by the blast. Two days later, Mr.

Robinson detonated the second bomb; he lingered in agony for several hours before succumbing to his wounds. An alert security officer intercepted the third bomb at the Court of Appeals building in Atlanta, and employees at the Jacksonville NAACP did not open the fourth bomb because they had heard about the other bombings.

Moody then mailed letters threatening assassinations in the name of a fictitious anti-black organization, "Americans For a Competent Federal Judicial System," to each judge of this court; Martelle Layfield, the recently deceased editor of the ABA Journal; the Jacksonville NAACP; and Brenda Wood, an Atlanta television news anchor.

Moody told his wife, after seeing a news report concerning the bomb that injured Maryland state judge John Corderman on December 22, 1989, "I didn't do that one," or "That one is not mine." F19–1501. A few months later, agents electronically taped Moody when he said to himself, "Now you've killed two.... Now you can't pull another bombin'...." GX 1078.

The government's investigation determined that only one pipe bomb in all its records matched the characteristics of the four mail bombs in this case by containing end plates secured by threaded rods or bolts in a box designed for mailing: the one recovered from Moody's residence in 1972. FBI explosive expert Special Agent James T. Thurman concluded that the four package bombs and the 1972 bomb were made by the same person. On February 15, 1990, federal agents recovered a pipe bomb, the "Chamblee device," in a previous Moody residence. Agent Thurman stated that this bomb was, in all probability, a transition device between the 1972 and 1989 bombs.

Moody took the stand as his only witness for four days of narrative testimony. Moody reviewed and contested his 1972 conviction, again maintaining that "Gene Wallace" had placed the bomb in his home. Moody confessed that his attempt to overturn this conviction was based on falsified evidence. Moody testified that the experiments he was conducting in his two home workshops were his attempts to replicate the recent cold fusion experiment, and that the Chamblee device was a homemade assembly for a paint spray gun. Moody said he had never heard of Judge Vance or Robert Robinson, and that his former attorney, Michael Ford (who had been Mr. Robinson's law partner), had admitted to his own involvement in the mail bombings. Moody said that he did not arrive in the Atlanta area until 10:30 p.m. on December 16, 1989, so he could not have mailed the bombs.

The government called 15 witnesses in a single day of rebuttal testimony. Michael Ford returned to the stand and vehemently denied having anything to do with the mail bombings. Two witnesses, responding to Moody's claims to be non-violent, testified that Moody had attempted to murder them in 1982. A professor of physics testified that Moody's claim regarding cold fusion made no sense. A former paint shop operator testified that the Chamblee device could not be a paint spray gun. Finally, a former gas station attendant testified that her initials were on a gas receipt signed by Moody sometime before 2:40 in the afternoon of December 16, 1989 in Griffin, Georgia, directly contradicting Moody's alibi story.

The jury returned verdicts of guilty as to all counts. On August 20, 1991, Judge Devitt sentenced Moody to seven life sentences and four hundred years, to be served concurrently with each other. These sentences were to be served consecutive to a sentence previously imposed in the Middle District of Georgia for Moody's obstruction of justice in attempting to overturn his 1972 conviction. Moody timely appealed his convictions in this case.

## II.

### A

Moody first contends that the district court violated his Sixth Amendment right to counsel by allowing him to testify contrary to his counsel's wishes.

During the second week of the government's case in chief, Moody's two lawyers,

Edward Tolley and Donald Samuel, met *ex parte* with the district court with the government's consent. Counsel explained that Moody was insisting on testifying despite their repeated efforts to dissuade him. Counsel stated that they did not know what Moody's eventual testimony would be, and they advised the court that they could not say that Moody's testimony would constitute perjury.

One week later, the government rested its case. Tolley stated to the court at that time that Moody was insistent that he testify. Tolley also stated that he strongly recommended against such a course because Moody's testimony would be inconsistent with the defense as it had been conducted to that point, because it might be used against Moody in subsequent state prosecutions, and because his testimony was "not advisable." R23–2266–67. The court then questioned Moody himself. Moody assured the court that he had made a considered decision to testify and that he had received the contrary advice from his attorneys. The court directed Tolley to call Moody as a witness, and, at Tolley's request, permitted the testimony to proceed in narrative form. Moody's testimony spanned four days, and because his story was so incredible, it was damaging to him.

### B

The Supreme Court has stated that although trial counsel has the authority to make certain tactical decisions during a criminal trial, the defendant retains the ultimate authority to make fundamental decisions regarding his case, including "whether to ... testify in his or her own behalf." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). As the Court stated in *Faretta v. California,* 422 U.S. 806, 834 n. 45, 95 S.Ct. 2525, 2540 n. 45, 45 L.Ed.2d 562 (1975), " '[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so.' " (quoting *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971)). *See also Rock v. Arkansas,* 483 U.S. 44, 49, 107 S.Ct. 2704, 2707, 97 L.Ed.2d 37 (1987) ("it cannot be doubted that a defendant in a

criminal case has the right to take the witness stand and to testify in his or her own defense") and *United States v. Teague,* 953 F.2d 1525 (11th Cir.1992) (en banc), *petition for certiorari filed* (May 21, 1992).

After declaring that certain constitutional rights are so fundamental that they are deemed personal to a defendant and that he alone may decide whether these rights will be exercised or waived, the Seventh Circuit opined:

> ... the right to testify in one's own behalf is a personal one which may not be waived by counsel.
>
> We recognize that the exercise of certain constitutional rights, such as a defendant's Sixth Amendment right to present evidence and witnesses on his behalf, are subject to control and direction by defense counsel; however, we do not believe the decision whether the defendant will testify falls within the category. See *Wainwright v. Sykes,* 433 U.S. 72, 93 N. 1, 97 S.Ct. 2497, 2510 N. 2, 53 L.Ed.2d 594 (1977) (Burger, J., concurring) ("Only such basic decisions as whether to plead guilty, waive a jury or testify in one's own behalf are ultimately for the accused to make."). *See also United States v. Martinez,* 883 F.2d 750, 754–56 (9th Cir.1989).

*United States v. Curtis,* 742 F.2d 1070, 1076 (7th Cir.1984). This same sound principle is set forth in the *American Bar Association Standards Relating to the Administration of Criminal Justice,* Compilation p. 127 (1974) where we read:

> The decisions which are to be made by the accused after full consultation with counsel are: (i) what plea to enter; (ii) whether to waive jury trial; (iii) whether to testify in his own behalf.

We do not accept Moody's argument that such a rule would impermissibly burden the assertedly more fundamental right to counsel.

> When a defendant asserts that he desires to exercise his constitutional right to testify truthfully, counsel's duty is to inform the defendant why he believes this course will be unwise or dangerous. If a

defendant insists on testifying, however irrational that insistence might be from a tactical viewpoint, counsel must accede. We hold that a defendant's personal constitutional right to testify truthfully in his own behalf may not be waived by counsel as a matter of trial strategy. *Curtis,* 742 F.2d at 1076. That is precisely what occurred in this case. Moody's capable trial counsel advised him in the strongest possible terms not to testify, and Moody properly made his own decision in the matter.

We also reject Moody's final argument regarding his testimony, that the district court should have engaged in a more probing questioning of Moody to determine whether he fully understood the implications of his decision to testify. In our view, the able trial judge did what was required and no more. A trial judge should take care that he not unintentionally sway the defendant in making this fundamental choice.

Thus, the district court committed no error in allowing Moody to testify against the desires of his counsel and in refusing to question him at length about his decision.

### III.

Moody argues that, because the government's search warrants were defective, the district court erred in denying his motions to suppress evidence seized from his home and pickup truck. Moody specifically challenges the warrant issued on February 8, 1990 to search his residence in Rex, Georgia and his truck, and the warrant issued on July 10, 1990 to search the same residence. Moody does not contest any of the other searches conducted in this case.

First, Moody claims that the government had not established probable cause to search, because it had given insufficient reasons to suspect that evidence of the bombs was to be found. The magistrate judge's task "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v.*

*Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). This court must ask only whether the magistrate judge had a "substantial basis" for concluding that probable cause existed. *Id.* In doing so, we must give " 'great deference' " to the magistrate judge's assessment of the facts presented to him. *Id.* at 236, 103 S.Ct. at 2331 (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)).

■ The February 8, 1990 warrant was supported by an extremely detailed affidavit written by an experienced explosives expert, Special Agent Frank P. Lee of the Bureau of Alcohol, Tobacco and Firearms. The affidavit revealed that Moody had a motive for the bombings, namely, his frequently-expressed dissatisfaction with the courts, and this court in particular, because of the refusal to overturn his 1972 bomb possession conviction. The affidavit further revealed that the bomb Moody possessed in 1972 had unique features in common with the 1989 bombs; that Moody and his wife had made numerous trips to hardware and home supply stores in which they could have purchased the bomb components; that Moody had had legal training and experience that would enable him to use the legal jargon present in the numerous threat letters; and that many phrases in the letters matched previous examples of his writing.

■ The July 10, 1990 warrant was supported by a second affidavit that incorporated the Lee affidavit in addition to information learned subsequently, in part through electronic surveillance. This affidavit stated that Moody and his wife had viewed a composite videotape about the bombing investigation; that Moody's wife remarked that it was "odd" that he had started recording such broadcasts before he had become a target of the investigations (R3–Exhibit 17–Para. 5); and that he frequently referred to a journal or notebook that he was keeping. The information included in each affidavit without question provided a sufficient basis for the

magistrate judge to issue the two warrants.

Second, Moody maintains that the government did not specify what it was searching for with sufficient particularity, which allowed the government to conduct a general "fishing expedition." The Fourth Amendment does prohibit general exploratory searches through a particularity requirement, but this requirement "must be applied with a practical margin of flexibility, depending on the type of property to be seized.... [A] description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

■ It is true that the two warrants allowed the agents to seize a large number of items, including common household items such as "address labels," "envelopes," "paper clips," "pieces of cardboard," and "string." This is unobjectionable, however, since the alleged crimes involved homemade packaged bombs and correspondence. Though some of the items the government sought were not incriminating by themselves, the government's bomb expert, Agent Lee, linked each of them to the mail bombings. This court has previously upheld admission of evidence against a bomber when the search warrant authorized seizure of common goods such as "white string, brown paper, [and] corregated [sic] paper." *See United States v. Davis*, 589 F.2d 904, 906 (5th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979).[1] This court explained, in words equally applicable to this case, that such a description in the context of the bomb investigation was sufficiently particular because, "When an exact description of the objects of the search is a 'virtual impossibility, ... the searching officer can only be expected to describe the generic class of items he is seeking.'" *Id.* (quoting *James v. United States*, 416 F.2d 467 (5th Cir.

1969), *cert. denied*, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970)). We therefore reject Moody's particularity argument.

■■ Third, Moody claims that the government's searches violated his Fifth Amendment right against self-incrimination. However, this right attaches only when the government compels an individual personally to incriminate himself. *See SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742, 104 S.Ct. 2720, 2725, 81 L.Ed.2d 615 (1984). Because in this case all evidence seized was obtained pursuant to a valid search warrant and any statements made by Moody were voluntarily put to paper before the search, Moody cannot successfully challenge the searches under the Self-Incrimination Clause. *See Andresen v. Maryland*, 427 U.S. 463, 477, 96 S.Ct. 2737, 2746, 49 L.Ed.2d 627 (1976); *Fisher v. United States*, 425 U.S. 391, 399, 96 S.Ct. 1569, 1575, 48 L.Ed.2d 39 (1976).

■ Fourth, Moody alleges that the July 10 warrant, which involved a search for Moody's writings, journal, videotapes, and computer diskettes, violated his free speech and free press rights under the First Amendment. Moody relies on an obscenity case, *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), in which the defective warrant authorized executing officials to decide on their own which films were "similar" to two films determined to be obscene by a local justice. *Id.* at 321, 99 S.Ct. at 2321. In this case, by contrast, the searching officials did not have excessive authority to determine what constituted sizable items. Moody was suspected of sending threat letters to this court and around the country, so the government had a legitimate reason to search for his writings and papers. The government also had evidence that Moody was keeping a journal or notebook about the bombings, which gave the government cause to search for those items. Moody's First Amendment rights were in no way violated by the search.

1. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

Finally, Moody contends that the government acted in bad faith. The primary basis for this argument is that the government's affidavit stated, in three places, that Moody had "made" the 1972 bomb, even though he was acquitted of manufacturing the bomb and was only convicted of its possession. Moody reasons that this misstatement was an important factor in establishing probable cause. However, the government's affidavit also candidly stated that Moody had been acquitted of the manufacturing count. Agent Lee was entitled to refer to what he considered to be an historical fact that Moody had made the bomb, even though a jury did not so find beyond a reasonable doubt. The magistrate judge could then weigh the jury's decision against Agent Lee's conclusion, and make a determination about the sufficiency of the affidavit in the context of the entire 43 page document. We find no bad faith by the government, and we refuse to disturb the magistrate judge's well considered issuance of the two search warrants in this case.

### IV.

Moody argues that evidence acquired during court-authorized electronic surveillance of his home in April 1990 should have been suppressed because it was in violation of the minimization requirements set forth in 18 U.S.C. § 2518(5).

On April 1, 1990, Judge Richard Freeman of the Northern District of Georgia authorized the government to intercept "oral and wire communications of Walter Leroy Moody, Jr., and Susan McBride Moody" at Moody's home in Rex, Georgia. R3–Exhibit 3–5. This surveillance occurred from April 4 until May 3, 1990. The government, in addition to taping conversations between Moody and his wife, also occasionally taped Moody speaking to himself alone. The government played only two such "soliloquies" taped from Moody's home to the jury. In one, Moody said,

"Now you've killed two.... Now you can't pull another bombin'...." GX 1078. In the other, Moody complained that the courts were crooks. Judge Devitt conducted a pre-trial hearing on the matter and determined, in a written memorandum of law, that the monitoring agents acted reasonably to minimize the interception of communications outside the scope of the court authorization. Moody claims, to the contrary, that the evidence should have been suppressed.[2]

Electronic surveillance must be "conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). The Supreme Court in *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), set forth the standards for reviewing challenges to the government's minimization efforts. The *Scott* Court held that courts must make an objective assessment of the monitoring agents' actions in light of the facts and circumstances confronting them at the time. *Id.* at 136, 98 S.Ct. at 1723. The Court counselled that "[t]he statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Id.* at 140, 98 S.Ct. at 1724. The standard to be applied to the government's actions is one of reasonableness. *See United States v. Van Horn*, 789 F.2d 1492, 1501 (11th Cir.), *cert. denied*, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986). A district court's determination of whether a certain practice, under the circumstances, is reasonable is a factual determination subject to the clearly erroneous standard of review. *Id.* at 1502.

Judge Devitt accepted the agents' account that they could not always determine with certainty whether Moody was conversing with others or alone because their "spotters" had a difficult time know-

---

**2.** The government does not accept Moody's characterization of Judge Freeman's order that it only permitted the government to tape conversations between Moody and his wife. The government argues instead that the order would allow interception of purely personal "oral ... communications of Walter Leroy Moody, Jr. ..." alone. For the purpose of argument, the government, and we, accept Moody's construction of the order.

ing who was in the house. The court found that the agents had taped Moody speaking alone because they would begin to tape when Moody started talking, awaiting his wife's response, and occasionally that response was not forthcoming because she was not there. The court concluded that the "monitoring agents acted reasonably in monitoring defendant's comments for a brief period of time to determine whether defendant was speaking to anyone else." R10–74. The court's findings in this case are fully supported in the record, and we decline Moody's invitation to disturb them. Moody's minimization challenge accordingly fails.

## V.

Moody further contends that the electronic interceptions of Moody speaking to himself in his cell in the High Security Unit of the Atlanta Federal Penitentiary violated his Fifth Amendment rights against self-incrimination and his due process rights.

On July 24, 1990, Judge Freeman authorized the interception and recording of "oral communications" of Moody in his cell, in which Moody was incarcerated alone awaiting trial in his obstruction case. The agents recorded Moody from July 26 until October 29, 1990. Two comments that he made to himself concerning his vitriolic displeasure with the court system were admitted into evidence at trial.

 Moody argues first that these statements should be suppressed because the government, in eliciting and taping them, violated his right against self-incrimination under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, the *Miranda* procedural safeguards are required only in instances of custodial interrogation. The Supreme Court explored the meaning of the term "interrogation" in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Court held that the *Miranda* safeguards apply to express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the

police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689 (footnotes omitted). In the case at bar, the pressures to which Moody was submitted, and about which he now complains, were no more than "those normally attendant to ... custody." *Id.* Thus, Moody's *Miranda* claim must fail.

Our decision in this instance receives further support by the Supreme Court's decision in *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). In *Perkins*, the Court allowed evidence to be admitted, without invocation of the *Miranda* safeguards, that had been gathered through conversations between the defendant and his cellmate, who was in fact a government agent. The Court held that "[w]here the [incarcerated] suspect does not know that he is speaking to a government agent there is no reason to assume the possibility that the suspect might feel coerced." 496 U.S. at 292, 110 S.Ct. at 2395, 110 L.Ed.2d at 252. Even though the agent had initiated the conversations, there was no police-dominated coercive atmosphere and thus no custodial interrogation, the Court held. "Ploys to mislead a suspect ... that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns." *Id.* 496 U.S. at 297, 110 S.Ct. at 2397, 110 L.Ed.2d at 251. In this case, the alleged coercion by the government is significantly less than that which the Court allowed in *Perkins*— no one at all induced Moody to speak. Moody's statements to himself are "[v]olunteered statements" that *Miranda* specifically does not cover. *See Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630. Thus, the district court committed no error in admitting the statements into evidence.

 Moody also argues that the surveillance violated the Due Process Clause of the Fifth Amendment. However, the Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause...." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d

473 (1986). As we have already demonstrated, there was no coercive police activity in eliciting these statements; thus, Moody's due process challenge fails as well.

■ Finally, Moody's argument that there was no probable cause for the government to initiate the prison surveillance is wholly without merit. Judge Freeman knew from the government's previous surveillance of Moody at his home that he frequently talked to himself. Judge Freeman certainly had a substantial basis upon which to conclude that there was probable cause to issue the warrant.

## VI.

Moody received a fair and impartial trial before an able and experienced district judge. He was represented at that trial and on these appeals by very competent and diligent counsel.

For the aforementioned reasons, we affirm all of Moody's convictions.

AFFIRMED.