[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11809

_____

D.C. Docket No. 2:12-cv-04139-LSC

WALTER LEROY MOODY, JR.,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 16, 2017)

Before WILSON, MARTIN, and JORDAN, Circuit Judges.

PER CURIAM:

In 1991, a federal jury convicted Walter Leroy Moody, Jr. of 71 charges

related to the pipe-bomb murders of United States Circuit Judge Robert S. Vance

and civil rights attorney Robert E. Robinson. We affirmed Mr. Moody's convictions and sentences (seven consecutive life terms plus 400 years, to be served concurrently) in *United States v. Moody*, 977 F.2d 1425 (11th Cir. 1992).

Months after his federal trial ended, an Alabama grand jury indicted Mr. Moody on two counts of capital murder (for the death of Judge Vance) and one count of assault in the first degree (for injuries suffered by Judge Vance's wife). Mr. Moody represented himself at his state trial, which took place in October of 1996. The jury found him guilty as charged and recommended a sentence of death for the murders. The state trial court followed the jury's recommendation and sentenced Mr. Moody to death. The Alabama Court of Criminal Appeals affirmed, and the Alabama Supreme Court denied certiorari. *See Moody v. State*, 888 So. 2d 532 (Ala. Cr. App. 2003), *cert. denied*, 888 So. 2d 605 (Ala. 2004).

Following the denial of his state post-conviction motion, *see Moody v. State*, 95 So. 3d 827 (Ala. Cr. App. 2011), Mr. Moody sought federal habeas corpus relief pursuant to 28 U.S.C. § 2254. After we rejected Mr. Moody's contention that all judges in the Eleventh Circuit had to recuse from his § 2254 proceedings, *see In re Moody*, 755 F.3d 891 (11th Cir. 2014), the district court denied habeas relief in a thorough 189-page opinion. *See Moody v. Thomas*, 89 F. Supp. 3d 1167 (N.D. Ala. 2015).

2

We granted a certificate of appealability on a single issue: whether Mr. Moody knowingly and voluntarily waived his Sixth Amendment right to counsel at his state trial.  With the benefit of oral argument, and following review of the record, we conclude that the conclusion of the Alabama Court of Criminal Appeals that Mr. Moody knowingly and voluntarily waived his right to counsel was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  *See* 28 U.S.C. § 2254(d).[1]

## I

"The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." *Faretta v. California*, 422 U.S. 806, 807 (1975).  This "right to the assistance of counsel implicitly embodies a correlative right to dispense with a lawyer's help." *Id.* at 814 (quotation marks and citation omitted).  *See also id*. at 832–33 (grounding right to self-representation in the Sixth Amendment).

A defendant who "manages his own defense . . . relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel[.]" *Id.* at 835.  As a result, any waiver of the right to counsel must be "knowing, voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004)

---

[1] Because we deny Mr. Moody's Sixth Amendment claim on the merits, we need not and do not address the state's exhaustion argument.  *See* 28 U.S.C. § 2254(b)(2).

(citation omitted).   The defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (quotation marks and citation omitted).

"The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).   "[C]ourts indulge every reasonable presumption against waiver" and "do not presume acquiescence in the loss of fundamental rights."   *Id.* (quotation marks, footnotes, and citations omitted).   Nevertheless, "it is possible for a valid waiver of counsel to occur not only when a cooperative defendant affirmatively invokes his right to self-representation, but also when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled, understanding his only alternative is self-representation with its many attendant dangers." *United States v. Garey*, 540 F.3d 1253, 1265 (11th Cir. 2008) (en banc).

## II

In his direct appeal, Mr. Moody did not challenge the trial court's decision to permit him to represent himself at trial pursuant to *Faretta*.   He did, however, argue that the trial court erred in refusing to grant him, after *voir dire* examination

4

of the jurors had begun, a 12- to 18-month continuance so that he could obtain the services of two new attorneys who had expressed an interest in representing him. In analyzing the propriety of the trial court's denial of a continuance, the Alabama Court of Criminal Appeals *sua sponte* examined whether Mr. Moody had waived counsel prior to requesting the continuance. It reasoned that "if [Mr.] Moody never validly waived his right to counsel—and if [he] had arrived at trial without having been afforded the full protections of the Sixth Amendment—it would have been error for the trial court to have commenced the proceedings and to have required [Mr.] Moody to proceed through the trial without the aid of a lawyer." *Moody*, 888 So. 2d at 554.

The Court of Criminal Appeals began by thoroughly recounting the events "that culminated in [Mr.] Moody's proceeding through his trial without the aid of a lawyer." *Id.* at 546. Mr. Moody "first expressed his desire to proceed *pro se* in a motion filed on July 25, 1994, after he had asserted an unambiguous lack of confidence in the performance of his court-appointed attorneys." *Id.* at 554. After his request to proceed *pro se* was granted at a hearing on August 2, 1994, the Court of Criminal Appeals found Mr. Moody "steadfastly reaffirmed his desire to proceed *pro se*, until toward the end of the first day of *voir dire* examination." *Id.* at 556.

5

As the Court of Criminal Appeals explained, the trial court held two "lengthy colloquies" with Mr. Moody—one on August 2, 1994, and another on May 7, 1996—"during which it explicitly warned [Mr.] Moody of the perils of going forward without counsel," and made multiple inquiries over the course of the proceedings to determine whether Mr. Moody was "standing by his request to proceed *pro se*." *Id.* at 554–55. It also noted that Mr. Moody—who had been a party in 63 other legal proceedings (civil and criminal) and had proceeded *pro se* for all or part of about 35 of those proceedings—was "not a novice." *Id.* at 555.

The Court of Criminal Appeals assumed that Mr. Moody's original motivation for moving to proceed *pro se* was dissatisfaction with the performance of his appointed counsel, but nonetheless concluded that Mr. Moody's requests to proceed *pro se* remained clear and unequivocal regardless of his attorneys' alleged inadequacies. *See id.* It observed that Mr. Moody expressed some equivocation in the pretrial proceedings "around whether he desired standby counsel and the capacity in which any standby counsel would serve," but found that "[u]ltimately, [Mr.] Moody expressly stated that he did not want standby counsel." *Id.* at 555 n.22. There was no "equivocation amounting to a withdrawal of waiver of counsel in [Mr.] Moody's assertions at some of the pretrial hearings that he was being forced to proceed *pro se* because (according to [Mr.] Moody) no attorney could provide him with an adequate defense under the payment limitations imposed by

6

Alabama's statutory scheme for compensating appointed counsel." *Id.* at 555. "Each time after making such an assertion, [Mr.] Moody, when questioned by the trial court, reaffirmed his desire to represent himself." *Id.*  Significantly, the trial court also advised Mr. Moody on several occasions that, if he desired, it would appoint new counsel to represent him.  But Mr. Moody "never requested the appointment of new counsel or indicated that he had somehow obtained counsel on his own." *Id.*

Based on its review of the record, the Court of Criminal Appeals was "confident . . . that when [Mr.] Moody asserted his right to self-representation, he knew what lay ahead of him." *Id.* at 556.  In sum, Mr. Moody's "*Faretta* rights were fully vindicated in the proceedings that led up to his trial." *Id.*

**III**

"In reviewing the district court's denial of a 28 U.S.C. § 2254 petition, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008) (quotations and citations omitted).  Whether a defendant has validly waived the right to counsel is a mixed question of law and fact. *See Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1063 (11th Cir. 1986).

Under the Anti-Terrorism and Effective Death Penalty Act of 1996, however, "both the district court's review and our review is greatly circumscribed

7

and is highly deferential[.]" *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002) (citation omitted). We may grant habeas relief to Mr. Moody only if the adjudication of his Sixth Amendment claim by the Alabama Court of Criminal Appeals "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A state court's decision is "contrary to" clearly established federal law if it either "applies a rule different from the governing law set forth in [the Supreme Court's] cases," or "if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted). A state court unreasonably applies clearly established federal law if it "correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Id.* (citation omitted). "An *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (quotation marks and citation omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated

8

on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)[.]" *Miller-El* v. *Cockrell*, 537 U.S. 322, 340 (2003) (citation omitted).

## IV

Mr. Moody contends that the Alabama Court of Criminal Appeals committed a number of errors. First, he argues that it failed to apply the presumption against waiver of the right to counsel. Second, he says that it failed to review all of the facts and circumstances involved. Third, he maintains that it failed to consider the trial court's legal misstatements. We discuss each of these challenges below, but combine the first two together because they are interrelated.

## A

Mr. Moody, emphasizing that courts must indulge every reasonable presumption against the waiver of the right to counsel, *see Zerbst*, 304 U.S. at 464, says that the Court of Criminal Appeals actually applied a presumption in favor of waiver. We disagree. For starters, we note that the scenario here does not merely involve the waiver of a single constitutional right, but rather the assertion of one Sixth Amendment right (the right to self-representation) and the correlative waiver of another Sixth Amendment right (the right to counsel). *See Marshall v. Rodgers*, __ U.S. __, 133 S. Ct. 1446, 1450 (2013). *See also Cross v. United States*, 893

9

F.2d 1287, 1290 (11th Cir. 1990) ("self-representation necessarily entails the waiver of the [S]ixth [A]mendment right to counsel"). We recognize that portions of the extensive five-year pre-trial record, if read in the light most favorable to Mr. Moody, might give us some pause if we were exercising plenary review of a Sixth Amendment claim on direct appeal from a federal conviction. But we are not conducting such an unfettered analysis here. Instead, we are reviewing the decision of the Court of Criminal Appeals under AEDPA deference, and that makes a difference.

Mr. Moody filed his "Motion to Defend Pro Se" shortly after his attorneys, Richard S. Jaffe and L. Dan Turberville, moved to withdraw based on irreconcilable differences. In his motion Mr. Moody sought to "exercise[ ] his absolute right to defend *pro se*[.]" He requested that, "[i]f the court sees fit to appoint an attorney to advise defendant under [Alabama] Rule [of Criminal Procedure] 6.1(b)," that it be someone who did not normally practice in the Birmingham courts.[2]

---

[2]At the time, Rule 6.1(b) read as follows:

> A defendant may waive his or her right to counsel in writing or on the record, after the court has ascertained that the defendant knowingly, intelligently, and voluntarily desires to forgo that right. At the time of accepting a defendant's waiver of the right to counsel, the court shall inform the defendant that the waiver may be withdrawn and counsel appointed or retained at any stage of the proceedings. *When a defendant waives the right to counsel, the court may appoint an attorney to advise the defendant during any stage of the proceedings.*

10

At the hearing that followed, on August 2, 1994, Mr. Moody explained that "really my motion was that I be allowed to represent myself *pro se* based upon my absolute right to do so.  And that the court appoint an attorney to assist me."  The trial court explained to Mr. Moody several times that he was entitled to have an attorney or to represent himself, but that he was not entitled to hybrid representation with an attorney acting as his co-counsel.  In response, Mr. Moody said that he "want[ed] to be on record as being the lead counsel in th[e] case" because he had been "living with" the case for four years and knew the facts and how to uncover fabricated evidence.  Mr. Moody explained his request to proceed *pro se* but with the assistance of "co-counsel" as follows:

> So, I need to be -- to have -- to be in a position to say this is what we need to do and provide the attorney with the information that he needs to do it. . . . I plan for that attorney to be my liaison between myself and the court, myself and the state, myself and all the experts, myself and everybody else that is going to support the defense.  So, if it works as I plan, you won't hear a peep out of me in court until the day of the trial.

The trial court then clarified the respective roles of the attorney and the client in the following exchange:

> COURT:    [T]he tactics and the way the trial proceeds, the lawyer makes the call on that.

---

Such advisory counsel shall be given notice of all matters of which the defendant is notified.

Ala. R. Crim. P. 6.1(b) (1994) (emphasis added).

11

MOODY:    That's what I want.

COURT:    Not you, sir.

MOODY:    No, sir.

COURT:    Now, I don't want you and I to have any misunderstandings on that.

MOODY:    Neither do I.  Now, when I say I want to represent myself, I want to be in charge of strategy, I want to be in charge of organizing the theory of the defense.

COURT:    Yes, sir.  I understand that.  What I am trying to explain to you is, to do that you will be by yourself.

MOODY:    Right.

COURT:    If you're going to have a lawyer, the lawyer will be in charge of that.

MOODY:    Sir, I realize that.

COURT:    You and he can certainly -- or you and them certainly can, you know, talk among yourselves and --

MOODY:    That's precisely the problem I am trying to correct now.

The trial court also went to great lengths to explain to Mr. Moody the risks and disadvantages of proceeding *pro se*, the charges and penalties he faced, and what could be expected in the trial and sentencing proceedings.  The trial court also considered Mr. Moody's age (60), IQ (120), and educational background (three years of undergraduate studies and some law school courses).  The trial court warned Mr. Moody that, in its opinion, representing himself would be a "foolhardy

12

endeavor" and advised against it.  The trial court told Mr. Moody that he continued to have a constitutional right to have counsel appointed should he change his mind in the future, but warned him that if he proceeded *pro se*, and, at a later point in time requested counsel, the trial would not be further delayed.

Mr. Moody indicated that he understood the trial court's advice and admonitions.  At one point he said that "no one can sit here today and perceive all of the ramifications of me proceeding *pro se*.  But as each one of these things come up I will address it to the best of my ability and use whatever resources the [c]ourt makes available to me."  At the conclusion of the colloquy, Mr. Moody repeated that it was his desire to proceed *pro se*, and the trial court granted his motion.

Two days after the hearing, Mr. Moody wrote to the trial court complaining about its appointment of Mr. Jaffe to represent him at oral argument before the Alabama Court of Criminal Appeals on his writ of prohibition concerning the state comptroller's refusal to make interim payments to the defense under Alabama Code § 15-21-12.  Mr. Moody objected to the appointment of Mr. Jaffe because he was now *pro* se, explaining that such "[d]isregard for my input is one of the main reasons why I insisted on proceeding *pro se*."  He also said that he had "given considerable thought to the various cautions" given to him by the trial court regarding the limitations that would be imposed on an attorney assigned to assist

13

him, and had determined that he did not want "the court to appoint an attorney to assist [him]."[3]

The next week, Mr. Moody filed a "Motion for Equal Justice." He stated that, "in electing to represent himself *pro se*," he sought to "remedy the lack of leadership, lack of work, lack of interest and lack of funding that, for two and a half years, have denied him adequate representation," and asserted that he "should be applauded for exercising his constitutional right to represent himself[.]"

Mr. Moody relies heavily on what happened after August of 1994 to argue that the trial court should have reevaluated and reassessed its decision to allow him to represent himself. In effect, Mr. Moody seems to be saying that he withdrew his waiver of the right to counsel. The district court rejected this assertion for three compelling reasons. First, it was procedurally barred. *See Moody*, 89 F. Supp. 3d at 1212. Second, it was an inaccurate portrayal of the record (or was at least based on a view of the record that accorded no deference). *See id.* at 1212–13. Third, it was foreclosed by the Supreme Court's decision in *Marshall*, 133 S. Ct. at 1449–50. *See Moody*, 89 F. Supp. 3d at 1213–14. We think the district court's analysis is correct as to all three grounds, and elaborate a bit on the third.

---

[3] Mr. Moody's challenges to § 15-12-21 resulted in several published opinions and unpublished decisions by the Alabama Courts. *See*, *e.g.*, *Ex parte Moody*, 684 So. 2d 114, 121 (Ala. 1996) (holding that "an indigent defendant is not entitled to the expert of his particular choice, but is entitled to a competent expert in the field of expertise that has been found necessary to the defense").

14

*Zerbst* requires that "courts indulge every reasonable presumption against waiver of fundamental constitutional rights[.]" 304 U.S. at 464 (quotation marks and citation omitted). Mr. Moody's contention seems to be that this presumption should be applied indefinitely, even after a defendant has effected a valid Sixth Amendment waiver. This argument, as we previously noted, ignores the "tension" between the Sixth Amendment's "guarantee of the right to counsel," on the one hand, and "its concurrent promise of a constitutional right to proceed *without* counsel when a criminal defendant voluntarily and intelligently elects to do so," on the other. *Rodgers*, 133 S. Ct. at 1450 (quotations, brackets, and citations omitted).

If this were a direct appeal, we might have to perform a post-waiver analysis of the record and decide whether to follow the "broad consensus" of other circuits that have held that "once waived, the right to counsel is no longer unqualified." *United States v. Kerr*, 752 F.3d 206, 220 (2d Cir. 2014) (citing cases). But in the habeas context, it is sufficient for us to note that the Supreme Court, in *Marshall*, has already determined that there is no clearly established federal law with regard to how a court is to treat a request for counsel made after a valid *Faretta* waiver. 133 S. Ct. at 1450. In so doing, the Supreme Court rejected the notion that general Sixth Amendment principles can supply such clearly established federal law. *See id.* at 1449. Given that there is no Supreme Court precedent on point, we cannot

15

say that the decision of the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law.

**B**

Mr. Moody argues that the trial court misinformed him about his right to counsel, and about the assistance of standby counsel, thereby rendering his decision to represent himself unknowing. Given the deference AEDPA calls for, the argument does not carry the day.

The trial court engaged in a "lengthy colloquy" with Mr. Moody on August 2, 1994, and "warned him that he would be at a significant disadvantage without counsel; that, as a non-lawyer, he would be 'ill-equipped' to make arguments to the jury; and that [it] considered his desire to represent himself to be 'a foolhardy endeavor.'" *Moody*, 888 So. 2d at 547. The trial court also advised Mr. Moody of the charges and the penalties he faced, conducted an inquiry into his background, education, intelligence, and legal experience, and "urged [Mr.] Moody to accept counsel." *Id.*

There is no mandatory script that a court must read to a defendant who is thinking about representing himself at trial. "The information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Tovar*,

16

541 U.S. at 88 (citation omitted).  In assessing the totality of the circumstances here, therefore, we take into account not only the colloquies between the trial court and Mr. Moody, but also the information revealed by the record.  *See Fitzpatrick*, 800 F.2d at 1066 (reviewing several factors to determine whether the risks of a *pro se* defense are understood, including whether a defendant is represented by counsel before trial and the defendant's knowledge of the nature of the charges and possible penalty he was subject to if convicted).

By August of 1994 Mr. Moody had been represented for over two years by Mr. Jaffe and Mr. Turberville.  He had also been a party in 63 other legal proceedings (civil and criminal) and had proceeded *pro se* for all or part of about 35 of those proceedings.  *See Moody*, 888 So. 2d at 547.  Mr. Moody had also sat through a federal trial based on the same underlying events with much of the same evidence, a trial in which he "took the stand as his only witness for four days of narrative testimony."  *Moody*, 977 F.2d at 1429.[4]

According to Mr. Moody, the trial court incorrectly described the assistance he could have from standby counsel if he represented himself.  As Mr. Moody sees things, the trial court (and the Alabama Court of Criminal Appeals) erroneously characterized his request as a request for "hybrid representation" when it was

---

[4] On appeal of his federal convictions, Mr. Moody unsuccessfully argued that the district court violated his Sixth Amendment right to counsel by allowing him to testify contrary to his counsel's wishes.  Mr. Moody's counsel had explained that Mr. Moody "was insisting on testifying despite their repeated efforts to dissuade him."  *Moody*, 977 F.2d at 1430.

17

really a request for standby counsel. We assume, without deciding, that at times the trial court's explanation of what standby counsel could do was not completely accurate. Mr. Moody, for example, points to the trial court's statement at the hearing on August 2, 1994, that standby counsel could not help him at all with any pretrial matters. But even with this assumption, we do not think Mr. Moody is entitled to habeas corpus relief.[5]

There is no categorical bar on the assistance of standby counsel for a defendant who has elected to represent himself at trial. *See McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984). Indeed, where it is necessary, a trial court may appoint standby counsel over the objection of a defendant who has chosen not to have the assistance of an attorney. *See Martinez v. Court of Appeal of California*, 528 U.S. 152, 162 (2000). Nevertheless, "*Faretta* does not require a trial judge to permit 'hybrid' representation," in which an attorney does certain things at trial (as a type of co-counsel) while the defendant, who has chosen to proceed *pro se*, does others. *See McKaskle*, 465 U.S. at 183.

The Alabama Court of Criminal Appeals held that the trial court did not err by failing to appoint standby counsel. *See Moody*, 888 So. 2d at 559–63. Notably,

---

[5] For one description of the differences between hybrid representation and standby counsel, see Joseph Colquitt, *Hybrid Representation: Standing the Two-Sided Coin on Its Edge*, 38 Wake Forest L. Rev. 55, 74–55 (2003).

18

it characterized Mr. Moody's request for counsel to assist him in representing himself *pro se* in this way:

> [Mr.] Moody intended to assent to the appointment of standby counsel only if such counsel would function as what amounted to his legal-research assistant, and only if such counsel would perform extensive pretrial investigation at his direction. It is clear that [Mr.] Moody wanted to exercise complete control over any [of] counsel's actions, including all tactical and strategic decisions as to how to prepare and present the case.

*Id.* at 559–60. It ruled that Mr. Moody was not entitled to a "hybridized representation of his own design[,]" and observed that, had the trial court appointed standby counsel over his objections, Mr. Moody would be arguing that was a ground for reversal. *Id.* at 560 (citations omitted).

The record here supports the conclusion of the Alabama Court of Criminal Appeals that, on the question of standby counsel, "[Mr.] Moody was evasive" and that, "ultimately, he never asserted an unequivocal desire to have standby counsel appointed." *Moody*, 888 So. 2d at 549. When he asked to proceed *pro se*, Mr. Moody requested only that, if the trial court saw fit to appoint an attorney to advise him, it be someone who did not practice in Birmingham. At the hearing on August 2, 1994, Mr. Moody said inconsistently that he wanted an attorney to make the calls on strategy and evidence and that he—and not the attorney—would be in charge of strategic decisions and the theory of defense. Following the trial court's colloquy at that hearing, and after he had reaffirmed his desire to proceed *pro se*,

19

Mr. Moody separately requested that he be permitted to provide the court with a written description of the "type of lawyer assistance" he desired in the case. Two days later, however, he wrote to the trial court stating that he did not want an attorney to assist him.

The following week, in his "Motion for Equal Justice," Mr. Moody asked the trial court to reappoint Mr. Jaffe and to appoint another attorney, Mr. Tommy Nail, "as co-counsel to assist" him. The trial court had already explained to Mr. Moody that he did not have a constitutional right to hybrid co-counsel. *See Cross*, 893 F.2d at 1291–92. Even so, less than a week later, Mr. Moody rescinded the motion to reappoint Mr. Jaffe because his "past differences" with him had not been resolved.

Mr. Moody argues that he never actually withdrew his request for Mr. Nail's assistance, and that the Alabama Court of Criminal Appeals ignored this crucial fact. But he fails to take into account the trial court's order of August 31, 1994, which reserved ruling on Mr. Moody's request for assistance from Mr. Nail because it was not clear what type of representation Mr. Moody envisioned. In this order, the trial court asked that Mr. Moody clearly indicate "if he desires Mr. Nail to represent him in an advisory capacity only, or if he no longer wishes to proceed *pro se* and he wants to be represented by counsel." From what we can gather from the record, Mr. Moody did not respond to the trial court's order.

20

## V

"[T]he right to counsel is intended as a tool, not a tether." *Garey*, 540 F.3d at 1263. Given AEDPA deference, we see no basis for overturning the ruling of the Alabama Court of Criminal Appeals that Mr. Moody knowingly, voluntarily, and intelligently waived his right to counsel prior to proceeding to trial and that he rejected the assistance of standby counsel. The district court's denial of Mr. Moody's habeas corpus petition is therefore affirmed.

**AFFIRMED.**

MARTIN, Circuit Judge, concurring:

Criminal defendants have a constitutional right to represent themselves. This is true no matter how serious or complex their trial. It doesn't matter that the defendant has no specialized legal knowledge or experience which allow him to effectively advocate for himself. Neither does it matter that with no lawyer, a capital defendant is not likely able to give the jury the information it needs to make a fair and reliable decision about not only his guilt, but his punishment. Binding Supreme Court precedent requires only that a defendant make a valid waiver of his right to counsel in order to proceed on his own. Faretta v. California, 422 U.S. 806, 834–36, 95 S. Ct. 2525, 2540–41 (1975). Almost no one thinks it is a good idea for criminal defendants to represent themselves at trial. Even the Supreme Court in Faretta recognized "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." Id. at 834, 95 S. Ct. at 2540.

I agree with the majority's judgment that Walter Leroy Moody is not entitled to habeas relief. He did not present his Faretta claim to the Alabama Supreme Court, so he did not exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A). I write separately because this trial record demonstrates the troubling consequences of Faretta—particularly in capital cases. Representing himself at his capital trial, Mr. Moody made no objection to any evidence. He made no opening or closing

22

argument to the jury.  He failed to put on any defense.  He essentially refused to participate in the trial.  During the part of the trial in which the jury was called upon to decide whether he should be put to death, Mr. Moody gave them no evidence in mitigation.  After this paltry presentation, it is of little surprise that the jury found Mr. Moody guilty and then, by a vote of 11-1, recommended that he be sentenced to death.  This kind of one-sided proceeding is concerning not only because it fails to effectively protect the constitutional rights of capital defendants, but also because it fails to protect the public's interest in fair and accurate criminal proceedings.  As a U.S. court of appeals we are bound by Faretta, but I hope the Supreme Court will reconsider the contours of this rule in the context of capital trials.

## I.

The Supreme Court recognized the constitutional right to self-representation in 1975, holding that a criminal defendant could proceed without counsel "when he voluntarily and intelligently elects to do so."  Faretta, 422 U.S. at 807, 95 S. Ct. at 2527.  The Court acknowledged at the time that its holding was in discord with a long line of precedent emphasizing that "the help of a lawyer is essential to assure the defendant a fair trial."  Id. at 832–33, 95 S. Ct. 2540.  See, e.g., Argersinger v. Hamlin, 407 U.S. 25, 31, 92 S. Ct. 2006, 2009 (1972) ("The assistance of counsel is often a requisite to the very existence of a fair trial."); Powell v. Alabama, 287

23

U.S. 45, 68–69, 53 S. Ct. 55, 64 (1932) ("The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.").

The dissenters in Faretta criticized the majority's holding as inconsistent with the defendant's right to a fair trial and society's interest in just criminal proceedings. Chief Justice Burger predicted the right to self-representation would "only add to the problems of an already malfunctioning criminal justice system." Faretta, 422 U.S. at 837, 95 S. Ct. at 2542 (Burger, C.J., dissenting). He said "th[e] goal [of ensuring justice] is ill-served, and the integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel." Id. at 839, 95 S. Ct. at 2543. Along the same lines, Justice Blackmun called the decision "a drastic curtailment of the interest of the State in seeing that justice is done in a real and objective sense." Id. at 851, 95 S. Ct. at 2549 (Blackmun, J., dissenting).

The passage of time has done nothing to allay these fears. Indeed the Supreme Court has since observed that "experience has taught us that a pro se defense is usually a bad defense, particularly when compared to a defense provided by an experienced criminal defense attorney." Martinez v. Court of Appeal of Cal., Fourth Appellate Dist., 528 U.S. 152, 161, 120 S. Ct. 684, 691 (2000) (quotation omitted). And others have expressed dismay with the practical consequences of Faretta's holding. See, e.g., United States v. Farhad, 190 F.3d

24

1097, 1106–07 (9th Cir. 1999) (Reinhardt, J., concurring) (noting that the right to self-representation "frequently, though not always, conflicts squarely and inherently with the right to a fair trial"). These concerns are certainly at their apex in the context of capital trials, where the defendant's life is at stake.

## II.

We know that high quality legal representation is essential in capital trials. Capital trials are more complex. They have their own unique set of rules. See Murray v. Giarratano, 492 U.S. 1, 28, 109 S. Ct. 2765, 2780 (1989) (Stevens, J., dissenting) ("[T]his Court's death penalty jurisprudence unquestionably is difficult even for a trained lawyer to master."); ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 1.1, History of Guideline (rev. Feb. 2003), reprinted in 31 Hofstra L. Rev. 913, 921 (2003) ("[B]ecause of the extraordinary complexity and demands of capital cases, a significantly greater degree of skill and experience on the part of defense counsel is required than in a noncapital case."). Because of the severity and finality of the death penalty, the Supreme Court has imposed a number of procedural protections that apply only in capital cases. These constitutionally required protections seek to ensure greater reliability in the decision making at both the guilt and penalty phases of capital trials. See, e.g., Beck v. Alabama, 447 U.S. 625, 627, 637–38, 100 S. Ct. 2382, 2384, 2389–90 (1980) (holding that the jury must be instructed on

25

lesser included offenses supported by the evidence in the guilt phase of a capital trial); Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964–65 (1978) (plurality opinion) (requiring consideration of any relevant mitigating evidence during the penalty phase of a capital trial).  When capital defendants are tried without the help of a lawyer, however, these extra protections can be meaningless.

This is borne out by what happened at Mr. Moody's trial after the judge found he had waived his right to counsel.  Or better said—what didn't happen.  Mr. Moody made no opening statement or closing argument.  He made no objections to the evidence, and he called no witnesses.  And the crucial penalty phase of trial was no different.  The State presented the jury with its case in aggravation and asked the jurors to recommend a sentence of death.  Mr. Moody sat silent, offering nothing in mitigation.  See Moody v. State, 888 So. 2d 532, 552–53 (Ala. Crim. App. 2003).

The penalty phase of a capital trial is a separate proceeding in which the jury is asked to decide whether the person it just convicted of a capital offense should be put to death by act of the state, or instead receive a life sentence.  E.g., Ala. Code § 13A-5-45.  At sentencing, the prosecutor asks the jury to sentence the defendant to death. Often, as was the case in Mr. Moody's trial, the prosecutor can highlight the unfathomable cruelty shown by the defendant, as well as the resulting horrific and senseless deaths.  The job then falls to the defense counsel to educate

26

the jury about the defendant by telling his story in such a way as to communicate how this defendant came to do this horrible thing.  It is well established that "before a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense."  Abdul-Kabir v. Quarterman, 550 U.S. 233, 263–64, 127 S. Ct. 1654, 1674 (2007).  But when the jury hears only one side of the story, it can't do that.  Without knowing a person's background and character, a jury has no way of knowing whether death is the appropriate sentence.

More than 80 years ago, the Supreme Court told us that to allow a person charged with a capital offense to be "prosecuted by counsel for the state without assignment of counsel for his defense, tried, convicted, and sentenced to death . . . would be little short of judicial murder."  Powell, 287 U.S. at 72, 53 S. Ct. at 65.  But even now our precedent permits capital defendants to undermine their own defense by choosing to proceed without counsel.  State courts are not required to appoint standby counsel to assist pro se capital defendants, and the trial judge declined to do so for Mr. Moody.  Moody, 888 So. 2d at 552.  Allowing a capital defendant to go before a jury without the assistance of counsel undermines the legitimacy of the criminal trial that results in his sentence of death.  See People v. Bloom, 774 P.2d 698, 727 (Cal. 1989) (Mosk, J., concurring and dissenting)

27

("Faretta . . . is not a sword for the defendant; he may not use the right of self-representation to . . . undermine the adversary process.").

The Supreme Court recently reaffirmed the continuing vitality of Faretta. Indiana v. Edwards, 554 U.S. 164, 178, 128 S. Ct. 2379, 2388 (2008) (explicitly declining to overrule Faretta). But the Court's decision in Edwards also confirmed that the right to self-representation is not absolute and may be limited under certain circumstances. See id. (holding that a state may deny a defendant the right to represent himself if he lacks the mental competency to conduct his own defense); see also Martinez, 528 U.S. at 163, 120 S. Ct. at 692 (holding there is no right to self-representation in a direct criminal appeal); McKaskle v. Wiggins, 465 U.S. 168, 184, 104 S. Ct. 944, 954 (1984) (holding that standby counsel may be appointed over a pro se defendant's objection). There are good reasons to limit the scope of this right in capital trials. We should not allow defendants to use the criminal justice system as "an instrument of self-destruction." Faretta, 422 U.S. at 840, 95 S. Ct. at 2543 (Burger, C.J., dissenting).